THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| PACIFIC SOUND RESOURCES, a Washington non-profit corporation; and THE PORT OF SEATTLE, a Washington municipal corporation, | Case No. C04-1654L |
| Plaintiffs, | **DEFENDANT THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY'S MOTION FOR SUMMARY JUDGMENT THAT PLAINTIFF THE PORT OF SEATTLE HAS INCURRED NO COMPENSABLE DAMAGES** |
| v. | |
| THE BURLINGTON NORTHERN AND SANTA FE RAILWAY CO., a Delaware corporation; J.H. BAXTER & CO., a California limited partnership; J.H. BAXTER & CO., a California corporation; and J.H. BAXTER & CO., INC., a California corporation, | NOTE ON MOTION CALENDAR: May 27, 2005 |
| Defendants. | |

## I.  RELIEF REQUESTED

Defendant The Burlington Northern and Santa Fe Railway Company ("BNSF") hereby moves for summary judgment in its favor on all claims alleged by Plaintiff The Port of Seattle ("Port") on the ground that the Port has incurred no compensable damages.  The Port has been, or will be, reimbursed by the Pacific Sound Resources Environmental Trust ("PSR Trust"), an entity affiliated with Plaintiff Pacific Sound Resources ("PSR"), for all remedial action costs the Port

allegedly incurred in this action.  Therefore, the Port has suffered no damages for which it is entitled to seek recovery from BNSF.

## II.  INTRODUCTION

Plaintiffs brought this action to recover remedial action costs they allegedly incurred to investigate and remediate contaminated marine sediments in an offshore area of Elliot Bay adjacent to the former location of a wood treating facility commonly referred to as the Wyckoff West Seattle Wood Treating Plant ("the Plant").  Complaint ¶ 3.9  The primary cause of action asserted by Plaintiffs is for contribution under the State of Washington's Model Toxics Control Act ("MTCA").  RCW 70.105D.080.  MTCA is modeled, in part, on the federal Comprehensive, Environmental Response, Compensation, and Liability Act ("CERCLA").  42 U.S.C. §§ 9601-9675.  In addition to their MTCA claim, Plaintiffs seek declaratory relief and have alleged common law claims for negligence, nuisance, and trespass.

This case is related to an earlier action filed by Plaintiffs in King County Superior Court in September 2002 to recover remedial action costs they allegedly incurred to investigate and remediate contamination at the Plant.  Both cases involve the PSR Superfund Site, which the U.S. Environmental Protection Agency has divided into two operable units: (1) the Upland Unit, consisting of the Plant; and (2) the Marine Sediments Unit, consisting of offshore marine sediments contaminated with hazardous substances associated with the Plant.  *See* 40 C.F.R. § 300.5 (defining "operable unit").

In the earlier action, the Superior Court granted the motions for summary judgment made by BNSF and the Baxter defendants[1] that Plaintiffs' claims are barred by the applicable statutes of limitation.  On June 14, 2004, the Superior Court entered final judgments for BNSF and Baxter.  Declaration of Thomas D. Adams ("Adams Dec.") at 7-9.[2]  In its motion, BNSF argued Plaintiffs' claims were limited to the Upland Unit (*i.e.*, the Plant) and were barred because

---

[1] The term "Baxter" refers collectively to:  J.H. Baxter & Co., a California limited partnership; J.H. Baxter & Co., a California corporation; and J.H Baxter & Co., Inc., a California corporation

[2] All documents cited herein, except for Plaintiffs' Complaint, are attached to the Declarations of Thomas D. Adams or Marc A. Zeppetello.

cleanup standards had been met in the Upland by no later than November 1998. Plaintiffs argued their claims included costs incurred in both the Upland and Marine Sediments Units. At the time it entered judgment for BNSF and Baxter, the Superior Court clarified that it had determined Plaintiffs had not presented claims for costs incurred in the Marine Sediments Unit, but that Plaintiffs were free to assert such claims in a separate action. *Id.* at 10-11.

On June 30, 2004, Plaintiffs appealed the judgments entered in the earlier action to the Washington Court of Appeals.[3]  On the same day, Plaintiffs filed this case in King County Superior Court to recover remedial action costs they allegedly incurred at the Marine Sediments Unit only. Complaint ¶ 3.9. BNSF and Baxter jointly removed this case to this Court.

Because the Port has incurred no costs in the marine sediments that have not been fully reimbursed by the PSR Trust, the Port has suffered no damages whatsoever. Such costs or damages are an essential element of each of the Port's causes of action. Accordingly, summary judgment should be entered against the Port and in favor of BNSF on all causes of action.

### III.  STATEMENT OF UNDISPUTED FACTS

Due to the lengthy and complicated factual background that provides the necessary context for this motion, BNSF is compelled to submit a large number of documents with the accompanying declarations of counsel. However, once that context is understood, the issues are straightforward and the material undisputed facts are documented in relatively few exhibits.

**A.   History of Wood Treating Operations**

The Plant consists of approximately 25 acres, including 22.7 acres of property formerly owned by PSR (and now owned by the Port) and 2.3 acres of State-owned harbor area formerly leased by PSR from the Department of Natural Resources. Adams Dec. at 13-14 (¶¶ 5-7), 15, 18.

Various companies conducted wood treating operations at the Plant from about 1912 to 1994. Complaint at ¶¶ 2.1, 2.4-2.6, 3.1, 3.7, 3.8; Adams Dec. at 25, 32. PSR and its corporate predecessor, the Wyckoff Company ("Wyckoff"), solely owned and were responsible for

---

[3] Washington Court of Appeals, Division 1, Case No. 54491-8-1. The parties have completed briefing on the appeal, and the Court of Appeals has scheduled oral argument for June 6, 2005.

operations at the Plant from December 1965 until 1994, when PSR ceased operations and sold its property at the Plant to the Port.  Adams Dec. at 18, 41 (¶4.1), 44 (¶6.2), 46 (¶11.1); 55 (¶7); Complaint at ¶ 2.1.

As a result of its operations, the Plant became contaminated with creosote, pentachlorophenol, chemonite, and other substances associated with wood-treating operations. Adams Dec. at  19, 56 (¶9); Complaint at ¶ 2.1.  A significant source of contamination was the "transfer table," used for loading and unloading retorts, which was located in a shallow unlined earthen pit known as the "transfer table pit."  Adams Dec. at 56 (¶9).

In 1980, Wyckoff submitted to the United States Environmental Protection Agency ("EPA"), pursuant to the federal Resource Conservation and Recovery Act ("RCRA"), a notice of hazardous waste activity and a hazardous waste permit application indicating that Wyckoff generated and stored various hazardous wastes at the Plant.  *Id.* at 66-71.  *See* 42 U.S.C. § 6930(a); 40 C.F.R. § 270.70(a)(1).  The notice and permit application brought the Plant into RCRA's newly established "cradle to grave" program for regulating hazardous wastes.

**B.    History of Enforcement Actions Against Wyckoff**

In August 1984, EPA issued an administrative order to Wyckoff pursuant to RCRA and the Clean Water Act ("CWA").  Adams Dec. at 72-76.  The order found, among other matters, that Wyckoff: (1) engaged in the unauthorized treatment of wastewaters containing wood treatment chemicals, which were stored in the transfer table pit and formed contaminated sludges; and (2) discharged pollutants to the Duwamish River without a permit by pumping accumulated mixtures of wastewater and contaminants out of the transfer table pit via a fire hose into a Metro storm sewer.  *Id.* at 74-76.

Following issuance of the administrative order, the government concluded that Wyckoff's conduct was criminal.  In plea agreements filed in this Court on March 11, 1985, the corporation, its President, and three employees pled guilty to criminal violations of federal environmental laws.  *United States v. The Wyckoff Company, Inc., et al.*, W.D. Wash. Case. No. CR84-167V. Adams Dec. at 77-82.  The corporation pled guilty to knowingly and willfully storing hazardous waste in the transfer table pit without a RCRA permit and to willfully and negligently

discharging pollutants into the Duwamish River without a CWA permit.  *Id.* at 77-78, 84-85. Wyckoff's President pled guilty to violating RCRA and its implementing regulations, and the employees pled guilty to conspiracy to violate the CWA.  *Id.* at 80, 82.

In September 1987, Wyckoff and EPA entered into an administrative consent order pursuant to RCRA and CERCLA.  *Id.* at 99-100.  The order required Wyckoff to:  (1) complete an investigation to determine the nature and extent of the hazards associated with the release of hazardous substances at or from the Plant; (2) perform a study to evaluate alternatives for appropriate corrective action deemed necessary by EPA; (3) perform an interim corrective action; and (4) submit a closure plan for the transfer table.  *Id.* at 100.

EPA found that Wyckoff's implementation of its administrative orders was slow and intermittent.  *Id*. at 19, 102.  Nevertheless, in January 1990, EPA issued yet another administrative order to Wyckoff, this one pursuant to RCRA and CERCLA.  *Id*. at 83.  This order required Wyckoff to: (1) post notice and construct a fence to eliminate unrestricted access to the Plant; (2) prepare and implement a number of interim measures work plans; and (3) prepare and implement a remedial investigation and feasibility study ("RI/FS") work plan.[4]  *Id.* at 86-98.

In March 1990, Wyckoff notified EPA that it did not have sufficient resources to comply with the administrative order and that, if ordered to comply, Wyckoff would file for bankruptcy. *Id*. at 103-04.  Wyckoff claimed the effect of the order was to require closure and dismantling of the wood treating plant, which would eliminate the cash flow needed to fund remedial actions at the Plant.  *Id.* at 105.  Wyckoff also informed EPA that the Port had expressed interest in purchasing Wyckoff's property at the Plant if it could do so without assuming any liability for the contamination.  *Id*. at 106.

Wyckoff made a four-part proposal to EPA:  (1) all Wyckoff assets would be devoted exclusively to costs of business operations and environmental projects; (2) Wyckoff would

---

[4] The purpose of an RI/FS is "is to assess site conditions and evaluate alternatives to the extent necessary to select a remedy." 40 C.F.R. § 300.430(a)(2). *See also* WAC § 170-340-200 (RI/FS means a remedial action that consists of activities to collect, develop, and evaluate sufficient information regarding a site to select a cleanup action).

negotiate for sale of its property at the Plant to the Port and continue required remedial actions, taking into account the Port's development plans for the Plant; (3) Wyckoff and EPA would coordinate and prioritize necessary remedial actions at the Plant and at the Wyckoff/Eagle Harbor Superfund Site, a contaminated facility on Bainbridge Island where Wyckoff also had conducted wood treating operations;[5] and (4) Wyckoff directors and management employees would be insulated from personal liability. *Id.* at 108-12.

Although EPA did not accept Wyckoff's proposal, EPA, Wyckoff (which changed its name to PSR in 1992 and later became the lead plaintiff in this case), and the Port began a series of negotiations that in 1994 resulted in agreements for closure of the Plant and the Port's acquisition and cleanup of PSR's property.

**C.    The Port's Acquisition of the PSR Property**

The Port was interested in PSR's property at the Plant in connection with its planned Southwest Harbor Cleanup and Redevelopment Project ("the SW Harbor Project"). Pursuant to the SW Harbor Project, the Port planned to enlarge and modernize its Terminal Five container shipping facility to ensure continued use by the Port's largest maritime customer, American President Lines. The Port expected the SW Harbor Project to generate large-scale economic benefits for the Pacific Northwest regional economy along with needed environmental restoration of contaminated lands in the Seattle Harbor. *Id.* at 19-20, 43-44 (¶¶6.1-6.2), 113-14.

The Port considered the Plant site to be a "key portion" of the SW Harbor Project. Yet the Port was reluctant to acquire the PSR property because this would result in substantial environmental liability for the Port as the property owner. *Id.* at 20, 114. Consequently, the Port negotiated a detailed scope of work with EPA to identify the specific remedial actions the Port would implement at the Plant in return for a covenant of no further liability from EPA. *Id.* at 20-22.

While negotiations with PSR and the Port continued, in May 1993 EPA proposed, with

---

[5] Eagle Harbor was operated in much the same manner as the Plant from the early 1900's to approximately 1988. *Id.* at 53-55 (¶¶4-5, 8). Any liabilities associated with Eagle Harbor are not a part of this action.

the full support of the Port, to add the Plant to the National Priorities List ("NPL") – the so-called "Superfund Sites" – of high-priority sites targeted for response actions under CERCLA. *Id.* at 55 (¶6), 116-17. Consistent with CERCLA and implementing regulations known as the National Contingency Plan ("NCP"), 40 C.F.R. Part 300, EPA began planning to investigate the nature and extent of contamination at the Plant, study feasible remedial alternatives, and select response actions. Adams Dec. at 42 (¶4.6).

On November 24, 1993, Wyckoff's successor, PSR, and the Port entered into an Agreement for Option to Purchase and for Purchase and Sale of Real Estate ("Purchase Agreement") concerning the PSR property at the Plant. *Id.* at 118-21. The Purchase Agreement recites, among other provisions, that: (1) PSR is in the process of negotiating a Consent Decree with EPA and natural resource damage trustees; (2) the Port and EPA are negotiating certain agreements relating to the acquisition of the PSR property, subject to a plan to remediate environmental damage on the property; and (3) the Port desires to obtain an option to purchase the property. *Id.* at 118.

The Purchase Agreement states that the Option Fee is $1.4 million. *Id.* at 119. The Port paid the Option Fee, and PSR disbursed the funds exclusively to its creditors, as required by the Purchase Agreement, to allay fears that those creditors might file involuntary bankruptcy proceedings against PSR. *Id.* at 21-22, 119, 123. The Purchase Agreement provides that, in the event the Port elects to exercise the Option, and upon closing of the purchase of the property, the total amount of the Option Fee paid by the Port to PSR "shall be applied and credited against the purchase price for the Property." *Id.* at 120. The Purchase Agreement states that the purchase price for the property "shall be $9,000,000."[6] *Id.* at 121.

---

[6] The Port had commissioned an appraisal that concluded the PSR property would have a fair market value of $8.2 million if there were no contamination. *Id.* at 20. The Port initiated negotiations with representatives of the PSR, EPA, and the United States Department of Justice by offering to pay $9.2 million (the appraised value of the property plus a $1million premium for a covenant not to sue from EPA). *Id.* at 20-21. The terms and conditions under which the Port would purchase the PSR property evolved during subsequent negotiations. *Id.* at 21-22. The agreed upon terms and conditions are set forth in the Agreement and Covenant Not to Sue Re PSR Superfund Site, discussed below.

In April 1994, EPA held a public RI/FS scoping meeting for what it at that time referred to as "the PSR site." *Id.* at 126. On May 5, 1994, EPA informed the scoping meeting participants and other interested parties that EPA had determined to separate the PSR site into two "operable units" – (1) the Upland Unit, which is co-extensive with the Plant; and (2) the Offshore or Marine Sediments Unit.[7] *Id.*

On May 31, 1994 EPA formally listed the "PSR Superfund Site" on the NPL. 59 Fed. Reg. 27,989 (May 31, 1994); *See* 40 C.F.R. Part 300 Appendix B. Adams Dec. at 42 (¶4.5). The NPL listing enabled EPA to obtain additional funding from the CERCLA Hazardous Substance Superfund for implementing and directing remedial actions at the Site. *See* 42 U.S.C § 9604(c)(1) (findings required for EPA to exceed $2 million limit on response actions).

In August 1994, this Court entered the Consent Decree that PSR and EPA had negotiated to resolve PSR's environmental liabilities associated with the Plant and the Wyckoff/Eagle Harbor Superfund Site (collectively "the Sites"). Adams Dec. at 50-65. The Decree was entered in the case the United States, the Suquamish Tribe, and the Muckleshoot Indian Tribe had filed approximately four months earlier, in May 1994, against PSR (formerly Wyckoff) and related parties. *United States, et al. v. Pacific Sound Resources, Inc., et al.*, W.D. Wash. Case C94-687. The complaint asserted claims under Sections 106 and 107 of CERCLA, 42 U.S.C. §§ 9606 and 9607, and sought natural resources damages, injunctive relief for response actions arising out of the release and/or disposal of hazardous substances at or from the Sites, recovery of all response costs incurred by the United States, and a declaration of the defendants' liability for future costs.

---

[7] EPA defines the term "Operable unit" to mean:

> a discrete action that comprises an incremental step toward comprehensively addressing site problems. This discrete portion of a remedial response manages migration, or eliminates or mitigates a release, threat of release, or pathway of exposure. *The cleanup of a site can be divided into a number of operable units, depending on the complexity of the problems associated with the site.* Operable units may address geographical portions of a site, specific site problems, or initial phases of an action, or may consist of any set of actions performed over time or any actions that are concurrent but located in different parts of a site.

40 C.F.R. § 300.5 (emphasis added).

1    Adams Dec. at 50-51.

2            Under the Decree, PSR committed to cease all wood treating operations at the Plant and

3    the heirs of Wyckoff founders and certain PSR management personnel agreed to convey their

4    inheritance and equity interests in PSR to the PSR Trust, which had been created during

5    negotiation of the Decree.  *Id.* at 52, 57-58.  The Decree required all PSR assets and resources to

6    be liquidated and the proceeds disbursed by the PSR Trust pursuant to the attached Liquidation

7    Plan.  *Id.* at 58-59 (¶16), 64.[8]  In return for the commitments of PSR and the individual

8    defendants, the plaintiffs covenanted not to file a civil action or take administrative action against

9    the defendants under CERCLA or RCRA, subject to certain exceptions, for matters arising out of

10   the releases of hazardous substances at the Sites, provided the defendants performed their

11   respective obligations under the Decree.  *Id.* at 60-61.

12           While it negotiated the Decree with PSR, EPA also negotiated two agreements with the

13   Port: (1) Agreement and Covenant Not to Sue Re PSR Superfund Site ("Prospective Purchaser

14   Agreement"); and (2) Administrative Order on Consent Re PSR Superfund Site ("AOC").  *Id.* at

15   37-49, 128-36.  In summary, the Prospective Purchaser Agreement resolved the Port's potential

16   liability to EPA for the PSR Superfund Site, in anticipation of its purchase of the PSR property,

17   and the AOC specified the response actions to be implemented by the Port at the Plant, under

18   EPA's supervision.

19           Under the Prospective Purchaser Agreement, which was executed in August 1994, the

20   Port agreed to provide two components of consideration.  *Id.* at 43 (¶5.3), 46 (¶11.1).  The Port

21   agreed to pay in cash into the PSR Trust $9 million, "including payments made into options and

22   escrow by the Port prior to the closing of the purchase and sale agreement for the PSR property."

23   *Id.* at 46 (¶11.1).  The Port further agreed to provide "in-kind consideration" in the form of

24   environmental response actions [at the PSR Superfund Site] valued at $7.2 million, in accordance

25

26   _____

[8] The Decree provides that the liquidation proceeds, "which are exclusively for the benefit of the
27   Plaintiffs shall be paid as follows: One half into the United States Hazardous Substance
     Superfund Trust…and the other one-half into the registry of this court, as set forth in the
28   Liquidation Plan, and in accordance with the Memorandum of Agreement ('MOA') among the
     Plaintiffs, Attachment 'A' hereto."  *Id.* at 58-59 (¶16).

THE BNSF RAILWAY CO'S MOTION FOR SUMMARY JUDGMENT THAT THE PORT            9
OF SEATTLE HAS INCURRED NO COMPENSIBLE DAMAGES

with one or more Port AOC's.  *Id.* at 43 (¶5.3), 46 (¶11.1).  In return, EPA agreed not to sue or take other enforcement action against the Port for injunctive relief or reimbursement of response costs with respect to the existing environmental contamination at the PSR Superfund Site.  *Id.* at 48 (¶12.1).  Similarly, the Port agreed not to assert any claims against the United States or against PSR or its principals, or against the PSR Trust (except pursuant to the Prospective Purchaser Agreement), for any costs arising out of response activities at the PSR Superfund Site.  *Id.* at 48-49 (¶12.2).  By entering into the Prospective Purchaser Agreement, *the Port expressly assumed no liability for any aquatic lands, including marine sediments, managed by the Department of Natural Resources.  Id.* at 45 (¶6.4).

The Prospective Purchaser Agreement recognizes that the Port would be undertaking activities at the Plant that combined elements of environmental response action and property improvement or redevelopment in connection with the SW Harbor Project.  EPA and the Port agreed that seventy-five percent of these activities would be deemed environmental response activities, and twenty-five percent would be deemed construction and/or redevelopment.  EPA and the Port further agreed that credit to the Port for in-kind consideration, and reimbursement from the PSR Trust from money paid to the PSR Trust by the Port, would accrue "at the rate of seventy-five cents for every dollar spent by the Port to implement EPA-approved work plans developed pursuant to a Port AOC."  *Id.* at 46 (¶11.2).

After the Port received full credit for the $7.2 million of in-kind consideration, the Prospective Purchaser Agreement provides that the Port will be reimbursed from the PSR Trust on a monthly basis, following the Port's submission, and EPA's acceptance, of appropriate invoices and documentation "of the activities performed and costs incurred by the Port during the preceding month in implementing this or other Port AOCs."  *Id.* at 47 (¶11.3).  The Port agreed not to seek any reimbursement of costs from the PSR Trust in excess of the $9 million paid by the Port for the PSR Property.[9]  *Id.* at 47 (¶11.3), 122-23.

_____

[9] The Port reserved the right to present claims to the Hazardous Substance Superfund for reimbursement of response costs which were not reimbursed by the PSR Trust and were not costs credited to the Port's $7.2 million of in-kind consideration.  *Id.* at 47 (¶11.3), 123.

THE BNSF RAILWAY CO'S MOTION FOR SUMMARY JUDGMENT THAT THE PORT OF SEATTLE HAS INCURRED NO COMPENSIBLE DAMAGES                    10

1  On or about October 13, 1994, after entry of the PSR Consent Decree and execution of

2  the Prospective Purchaser Agreement, PSR conveyed its property at the Plant to the Port. *Id.* at

3  24, 137-39.  PSR subsequently transferred to the PSR Trust the net proceeds paid by the Port for

4  the purchase of the PSR property, which amounted to approximately $7.3 million (not including

5  the Port's two previous option payments totaling $1,650,000).[10]  Declaration of Marc A.

6  Zeppetello ("Zeppetello Dec.") at 10, 12-13.

7  **D.      The Port's Cleanup and Redevelopment of the Plant**

8  The purpose of the AOC, which was issued in September 1994, was "to provide for EPA

9  oversight and control of all environmental response activity to be performed by the Port at the

10  Site."  Adams Dec. at 129.  The AOC identified a number of deliverables the Port had previously

11  submitted to EPA, and, together with an attached Statement of Work enumerated six additional

12  tasks to be performed by the Port at the Plant: (1) Project Management; (2) Assess Current

13  Conditions and Supplement Site Security/Control; (3) Site Stabilization and Plant Demolition

14  (Time Critical Removal Actions);[11] (4) Early Actions (Non-Time Critical Removal Actions); (5)

15  RI/FS Study Sampling; and (6) Surface Capping.  *Id.* 130-31.  The latter four tasks are discussed

16  below.[12]

17  The objective of Task 3, Site Stabilization and Plant Demolition, was to complete time-

18  critical actions necessary to reduce or minimize threats to public health or the environment.  *Id.* at

19  133.  To meet this objective, in 1995, the Port demolished the entire wood treating plant and

20  excavated and removed approximately 4,000 cubic yards of contaminated soil and sludge.  *Id.* at

21  26-27, 140.

22

23

24  [10] The initial Option Fee was $1.4 million, and in April 1994, the Port authorized its Executive Director to extend the option period and to fund an additional option payment of up to $250,000. Adams Dec. at 119, 124.  *See also* Zeppetello Dec. at 15 (option payments of $1,650,000).

25

26  [11] Time-critical actions generally are those initiated within a six-month period, while non-time-critical actions are those expected to have a planning period of at least six months before onsite activities begin.  *See* 40 C.F.R. § 300.415(b)(4).

27

28  [12] The first two tasks are not addressed because they involve management and assessment rather than actual cleanup activities.

1  The objective of Task 4, Early Non-Time Critical Removal Actions, was to implement

2  removal actions necessary to reduce or minimize the Plant's impact as a source of contaminants

3  to the surrounding area. *Id.* at 134. To meet this objective, in 1996, the Port installed a

4  subsurface physical containment barrier (a slurry wall) across the northern portion of the Plant to

5  prevent contaminants that float at or on top of the groundwater surface, referred to as light non-

6  aqueous phase liquids ("LNAPL"), from entering Elliot Bay and to dampen tidal effects in the

7  shallow groundwater at the Plant. The slurry wall is approximately 1,600 feet in length and

8  varies in depth from about 32 to 51 feet below the ground surface. *Id.* at 28. The Port also

9  installed an LNAPL recovery trench on the upland side of the slurry wall to intercept and recover

10  LNAPL before it could reach Elliott Bay. The LNAPL recovery trench is 1000 feet long, 15 feet

11  deep, and includes 10 recovery sumps. *Id.*

12  The objective of Task 5, RI/FS Sampling, was to ensure the collection of all soil,

13  groundwater, and surface water samples necessary for EPA to make remedial action decisions for

14  the Plant. *Id.* at 135. To meet this objective, the Port, among other tasks, conducted three rounds

15  of groundwater sampling between April 1995 and September 1996. *Id.* at 33-34.

16  The objective of Task 6, Surface Capping, was to construct a cap for the Plant that met

17  any requirements for soil and groundwater cleanups, as well as for the protection of human health

18  and the environment. *Id.* at 136. To meet this objective, the Port constructed a low-permeability

19  asphalt cap over a layer of clean fill placed at the Plant. The cap prevents any residual

20  contaminants from coming into contact with people or reaching Elliot Bay through either

21  migration to groundwater or surface water runoff. *Id.* at 29-30, 142. Construction of the cap was

22  completed by June 30, 1998. *Id.* at 143-44.

23  In September 1998, shortly after construction of the Plant-wide surface cap, the Port and

24  American President Lines officially dedicated the completed Global Gateway North container

25  transfer facility at Terminal 5, which includes the Plant. *Id.* at 145.

26  **E.  The Costs Allegedly Incurred By The Port At The Plant And The PSR Trust's
    Payments to the Port**

27  Beginning in March 1995, the Port submitted periodic "cost accounting reports" to EPA

documenting the work conducted and costs incurred by the Port at the Plant pursuant to the AOC. The Port's reports also requested EPA approval of the costs to be credited toward the Port's obligation, under the Prospective Purchaser Agreement, to provide $7.2 million of in-kind consideration.  (Because EPA and the Port agreed in the Prospective Purchaser Agreement that 75% of the Port's activities would be deemed environmental response activities and 25% would be deemed construction and/or redevelopment activities, the Port had to incur $9.6 million in costs to receive full credit for $7.2 million of in-kind consideration.)

Between March 1995 and March 1996, the Port submitted eleven cost accounting reports to EPA in which the Port claimed to have incurred total costs, through February 1996, of approximately $8.62 million and requested credit for approximately $6.47 million of in-kind consideration.  Zeppetello Dec. at 16-27.  EPA reviewed and approved the Port's reports, including the requested in-kind consideration credit. *Id.* at 28-38.

By its twelfth cost accounting report, submitted to EPA in June 1996, the Port claimed to have incurred total costs of approximately $12.65 million.  After subtracting $9.6 million (to meet the $7.2 million in-kind consideration obligation), the remainder was about $3.05 million. The Port requested reimbursement from the PSR Trust for 75% of this remainder, or $2,285,148.42.  *Id.* at 39-40.  Upon EPA approval of the Port's request, and at EPA's direction, the PSR Trust paid the Port $2,285,148.42.  *Id.* at 41, 43.

The Port's thirteenth, fourteenth, fifteenth, and sixteenth cost accounting reports requested EPA approval of additional costs and reimbursements from the PSR Trust.  *Id.* at 45-49.  EPA approved each of the Port's requests, and the PSR Trust made additional payments to the Port of $182,041.92 (report 13), $3,437,198.74 (report 14); $1,194,288.27 (report 15), and $72,494.08 (report 16).  *Id.* at 43, 50-58.  In total, for work performed at the Plant through its sixteenth cost accounting report, the Port claimed to have incurred about $19.16 million and the

1  PSR Trust reimbursed the Port over $7.17million.[13]

2  **F.  EPA Determines No Additional Remedial Actions Are Necessary At The Plant And, After A Separate Investigation and Design Process, Begins Implementing The Marine Sediments Remedy**

4  While the Port conducted the tasks specified in the AOC, EPA prepared a RI/FS for the

5  Plant.  EPA distributed the Draft RI/FS to various federal and state agencies for review in June

6  1997.  Adams Dec. at 146.  EPA subsequently directed the Port to prepare the Final RI/FS, even

7  though this task was not part of work required by the AOC.  *Id.* at 147.  The Final RI/FS, issued

8  in November 1998, concluded that:

9  …remedial measures already implemented in the upland are protective of surface water quality at the [point of compliance] (meets cleanup levels), and that additional remedial
10  actions in the upland are not necessary.  This finding satisfies MTCA requirements for groundwater cleanup actions (WAC 173-340-720(2) and WAC 173-340-720(6)).

11  *Id.* at 35.  The Final RI/FS also found that groundwater at the Plant is protective of human health

12  and the environment, complies with cleanup standards, and complies with applicable state and

13  federal laws.[14]  *Id.* at 35A.

14  EPA conducted a separate RI/FS process for the Marine Sediments Unit.  *Id.* at 151-56.

15  EPA began this RI/FS in 1996, and issued a draft Remedial Investigation Report and a draft

16  Feasibility Study in April 1998 and November 1998, respectively.  *Id.* at 151, 159-61.  The Port

17  did not prepare the RI or FS reports for this operable unit, and the AOC does not specify any Port

18  tasks in the marine sediments.

19  On September 30, 1999, EPA issued the Record of Decision ("ROD") presenting its

20  selected remedies for both operable units.[15]  For the Plant (*i.e.*, Upland Unit), EPA reaffirmed its

21

22  [13] The Port's fifteenth report covered the period through October 1998 and completion of the Plant-wide surface cap.  For work performed to that time, the Port claimed to have incurred total
23  costs of over $19.06 million and received reimbursements from the PSR Trust of approximately $7.10 million.  *Id.* at 43, 47.  The Port's sixteenth report, covering the period from November
24  1998 through June 2001, claimed additional costs of only about $96,658, of which the PSR Trust reimbursed the Port $72,494.08.  *Id.,* at 43, 49, 56-58.

25
26  [14] The Washington Department of Ecology ("Ecology") had determined that the groundwater at the Plant is not potable and, therefore, the cleanup did not have to meet MTCA groundwater
27  standards for drinking water.  *Id.* at 31, 36.

[15] EPA is required to document its selected remedy for a Superfund site in a Record of Decision.
28  40 C.F.R. § 300.430(f)(1)(ii).

THE BNSF RAILWAY CO'S MOTION FOR SUMMARY JUDGMENT THAT THE PORT     14
OF SEATTLE HAS INCURRED NO COMPENSIBLE DAMAGES

1  determination in the Final RI/FS that additional engineered remedial measures are not necessary

2  because the completed early actions had eliminated the risk posed by exposure to contaminated

3  soil and the groundwater met applicable cleanup requirements.  *Id.* at 149-50, 157.

4       EPA's remedy for the Marine Sediments Unit consists primarily of: (1) a cap of clean

5  material placed over approximately 50 acres of contaminated sediments; (2) dredging of

6  approximately 3,500 cubic yards of contaminated sediments to maintain navigational access; and

7  (3) removal of unused pilings.  *Id.* at 150, 158.  Implementation of the remedy began in July

8  2003, after EPA prepared a remedial design for the marine sediments cap.  *Id.* at 162-64.  The

9  U.S. Army Corps of Engineers and its contractors are performing the dredging and capping work

10  in the marine sediments, under EPA supervision.  *Id.* at 165.

11  **G.**    **The Port Conducted Limited Work In The Marine Sediments Pursuant To A**

       **Supplemental Administrative Order Which Provides That It Shall Be Reimbursed**

12         **For All Costs Incurred**

13       As noted previously, by entering into the Prospective Purchaser Agreement, the Port

14  assumed no liability for the marine sediments.  *Id.* at 45 (¶6.4).  Nevertheless, in December 2002,

15  the Port and EPA entered into a Supplemental Administrative Order On Consent Re PSR

16  Superfund Site ("Supplemental AOC") pursuant to which the Port subsequently conducted

17  certain remedial actions in the marine sediments, as set forth in an attached supplemental scope

18  of work.  *Id.* at 168-71.  EPA and the Port apparently entered into the Supplemental AOC

19  because the Port's costs to clean up the Plant had been less than previously anticipated so that,

20  under the Prospective Purchaser Agreement, the Port was entitled to request reimbursement from

21  the PSR Trust for additional costs incurred in the marine sediments.[16]  *Id.* at 123.

22       The Supplemental AOC states that it governs the Port's performance of response

23  activities under the same terms and conditions set forth in the 1994 AOC, except:

24

25  [16] In requesting Port Commission authorization to perform work in the marine sediments, its
Executive Director explained:  "At the time the parties entered the [Prospective Purchaser]
Agreement, both the Port and EPA anticipated that the cleanup required for the Port's use of the

26  property would exceed the amount the Port would spend in the purchase and fulfilling the in-kind
obligation….In brief, the Agreement did not contemplate the situation that currently exists, i.e.,

27  the Port has met its in-kind obligation of $7.2 million but has not recovered the maximum

28  amount of $9.0 million from the PSR Trust."  *Id.* at 123.

Because the parties agree there is no construction component to the supplemental response activities that are the subject of this AOC, *the reimbursement to the Port for the work shall be at 100 cents for each dollar expended*, rather than the 75 for each dollar as set forth in the 1994 AOC because 25% of the work required by the 1994 AOC was allocated to construction costs associated with the Port's development of the Site following the Port's purchase of the Site in conjunction with a Prospective Purchaser's Agreement with EPA.

*Id.* at 169.

During the Summer and Fall of 2003, the Port performed certain work in the Marine Sediments Unit consisting primarily of removing old pilings from the area where sediments are being capped by the U.S. Army Corps of Engineers.  *Id.* at 167, 170, 173 (¶2), 175.

In October 2003, the Port submitted its seventeenth and eighteenth cost accounting reports to EPA, which together covered work performed by the Port through September 30, 2003, and requested total reimbursement of $662,812.72.  Zeppetello Dec. 59-65.  These two reports include at least $490,985 for work performed in the marine sediments pursuant to the Supplemental AOC, as well as incidental costs for limited work at the Plant.  Adams Dec. at 173 (¶3), 175-76.  The Port requested reimbursement from the PSR Trust for 75% of the costs incurred at the Plant and 100% of the costs incurred in the marine sediments.  Zeppetello Dec. at 61-62, 64-65.

EPA approved the Port's seventeenth and eighteenth cost accounting reports, except for costs itemized as Port employee salaries, for which EPA withheld authorization pending further explanation and documentation.  *Id.* at 66.  EPA authorized reimbursement to the Port in the total amount of $583,470.50 under these two cost accounting reports, and in December 2003, the PSR Trust paid the Port $583,470.50.  *Id.* at 44, 66, 68.  EPA and the Port subsequently agreed that EPA would approve reimbursement of Port employee salaries for all work in the marine sediments under the Supplemental AOC because the Port performed this work in lieu of a consultant and for the sole benefit of EPA.[17]  *Id.* at 70, 72-74.

The Port claims to have incurred additional costs for work in the marine sediments, and

---

[17] EPA indicated that it will not authorize reimbursement for the staff charges included in the Port's seventeenth and eighteenth cost accounting reports for the limited work performed at the Plant under the 1994 AOC.  *Id.* at 73-74.

1   intends to submit a report of such costs to EPA for review and approval.  Adams Dec. at 173 (¶3),

2   176.  Pursuant to the Supplemental AOC, the Port is entitled to reimbursement from the PSR

3   Trust for 100% of these additional costs.

4   ### IV.  **STATEMENT OF ISSUE**

5          Whether the Port has suffered any compensable damages where the Port has been

6   reimbursed, or is entitled to reimbursement, from the PSR Trust for 100% of the remedial action

7   costs the Port allegedly has incurred for work performed in the Marine Sediments Unit and also is

8   entitled to 100% reimbursement for any reasonably foreseeable future costs.

9   ### V.  **EVIDENCE RELIED UPON**

10         This motion is based on the accompanying Declarations of Thomas D. Adams and Marc

11  A. Zeppetello, including the attached documents, and the pleadings on file herein.

12  ### VI.  **AUTHORITY AND ARGUMENT**

13  **A.**     **Summary Judgment Standard**

14         The purpose of summary judgment is to avoid unnecessary trials when there is no dispute

15  as to the facts before the court.  *Doggett v. Perez*, 348 F.Supp.2d 1198, 1202 (E.D. Wash. 2004).

16  Summary judgment is proper where the documentary evidence produced by the parties permits

17  only one conclusion.  *Id.*; Fed.R.Civ.P. 56.

18         The moving party has the initial burden to prove there is no genuine issue of material fact.

19  Once the moving party has carried its burden under Rule 56, its opponent must do more than

20  simply show there is some metaphysical doubt as to the material facts.  *Matsushita Elec.*

21  *Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).  The opposing

22  party must go beyond the pleadings to designate specific facts establishing a genuine issue for

23  trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548 (1986).

24         In ruling on a motion for summary judgment, all inferences drawn from the underlying

25  facts must be viewed in the light most favorable to the non-movant.  *Matsushita*, 475 U.S. at 587.

26  Nonetheless, summary judgment is required against a party who fails to make a showing

27  sufficient to establish an essential element of a claim, even if there are factual disputes regarding

28  other elements of the claim.  *Celotex*, 477 U.S. at 322-23; *Doggett*, 348 F.Supp.2d at 1202.

**B.** **The Port Has Suffered No Damages In The Marine Sediments And Seeks An Impermissible Double Recovery**

"It is a basic principle of damages, both tort and contract, that there shall be no double recovery for the same injury." *Eagle Point Condominium Owners Ass'n. v. Coy*, 102 Wash.App. 697, 702 (2000) (trial court properly offset prior settlement to assure plaintiff did not recover from two parties for the same damages).  However, an impermissible double recovery is exactly what the Port would receive here if it is allowed to obtain contribution from BNSF for the costs reimbursed to the Port from the PSR Trust.

The Port seeks contribution in this action only for costs it allegedly incurred in the marine sediments pursuant to the Supplemental AOC.  In performing work in the marine sediments, the Port functioned simply as an EPA contractor.[18]  EPA reviewed and approved the Port's costs, and authorized reimbursement to the Port -- *at 100 cents on the dollar* -- from funds the PSR Trust held for EPA's benefit, and which EPA controlled, in accordance with the PSR Consent Decree.  Because the Port, like any other fully-compensated contractor, has not incurred out-of-pocket costs in the marine sediments, it has suffered no compensable damages, and any additional amounts the Port seeks to recover from BNSF would constitute an impermissible double recovery.[19]

Through discovery, BNSF asked the Port to admit that it is not entitled to recover in this action any costs it has incurred performing work in the marine sediments that have been reimbursed to the Port pursuant to the Supplemental AOC.  The Port denied the request after

---

[18] The Port's express disclaimer in the Prospective Purchaser Agreement of any liability for the marine sediments (Adams Dec. at 45 (¶64)) demonstrates that, like an EPA contractor, the Port acted voluntarily and in its own interests in performing work the marine sediments, not because it was legally obligated to do so.

[19] In contrast to the marine sediments, the Port's alleged damages for work it performed at the Plant would raise numerous issues including, but not limited to:  (1) whether the entire $9.6 million the Port incurred to satisfy its obligation to provide $7.2 million of in-kind consideration constituted remedial action costs; (2) the appropriateness of the arbitrary 75:25 allocation between remedial costs and development costs set forth in the Prospective Purchaser Agreement; (3) the reasonableness of the consideration the Port paid for the PSR property and the covenant not to sue from EPA; and (4) the extent to which the Port's alleged damages should be offset due to the increased fair market value of the PSR property resulting from remediation and redevelopment.  None of these issues is relevant in this action.

---

objecting to the term "reimbursed" "since it implies that any 'reimbursement' was from funds provided by a third party." Zeppetello Dec. at 66-67.  The Port claimed that reimbursement under the Supplemental AOC came from the $9 million the Port had paid to PSR "to hold for the Port's use" in cleaning up the PSR property and, therefore, any reimbursement "came from the Port's own funds and not from any third party." *Id.* at 67.

There are three fatal problems with the Port's position:  (1) the Port paid the $9 million as the purchase price of the PSR property; (2) the $9 million was disbursed to the PSR Trust for the exclusive benefit of the trust beneficiaries and did not remain the Port's money; and (3) even assuming the reimbursements to the Port for work in the marine sediments were a partial refund of its $9 million payment, such reimbursements benefited the Port by effectively discounting the purchase price of the PSR property so that any contribution obtained by the Port from BNSF would still constitute an impermissible double recovery.

There is no merit to the Port's argument that the $9 million it paid in 1994 for the PSR property remained its own money.[20]  As required by the PSR Consent Decree, PSR deposited the funds paid by the Port directly into the PSR Trust, in which the funds were held, together with other funds from liquidation of PSR's assets, exclusively for the benefit of the PSR Trust beneficiaries; those beneficiary include EPA but not the Port.  Adams Dec at 58-59 (¶16), 62-63. Moreover, the PSR Trust used the $9 million paid by the Port for purposes other than reimbursing the Port, commingled the Port's payments with other funds held in the PSR Trust,

---

[20] It is undisputed that $9 million was the purchase price of the PSR property.  On its 1994 tax return, PSR reported $9 million as the proceeds from the sale of its property at the Plant. Zeppetello Dec. at 80.  *See also* Adams Dec. at 65 (parties to the Consent Decree contemplate that PSR's real property at the Plant would be acquired by the Port pursuant to the terms of an option agreement between the Port and PSR), 114 (Port will pay the PSR Trust for title to the property), 122 (Prospective Purchaser Agreement required the Port to acquire the PSR property for a purchase price of $9 million as delineated in option agreement).

and never separately accounted for "the Port's own funds."[21]  Zeppetello Dec. at 2 (¶¶2-3).  To the contrary, though the PSR Trust held funds in various accounts over the years, and most were not designated for a particular purpose, by August 2002, the trustee had established a specific "EPA subaccount" and, in July 2003, reimbursed the Port from this subaccount.  *Id.* at 2 (¶4), 84, 86-89.

The Prospective Purchaser Agreement does authorize the Port, once it fulfills its obligation to provide $7.2 million of in-kind consideration, to seek reimbursement from the PSR Trust, upon EPA approval, for additional costs incurred by the Port up to the $9 million the Port paid for the PSR property.  Adams Dec. at 47 (¶11.3).  However, to the extent the Port has been reimbursed from the PSR Trust's assets, the Port received the benefit of a substantial discount on the agreed-upon purchase price for the PSR property.[22]  In fact, for work it has conducted both at the Plant and in the marine sediments, the Port has been reimbursed to date approximately $7.75 million of the $9 million purchase price, and thus has effectively acquired the PSR property for only a small fraction of the fair market value it had eleven years ago, before being redeveloped and improved as an integral part of the Terminal 5 container shipping facility.  Given the benefit conferred on the Port for work performed in the marine sediments, in the form of partial refund of the purchase price of the PSR property, any contribution obtained by the Port in this action for the costs of such work would constitute an impermissible double recovery.

Regardless of whether the funds disbursed from PSR Trust represent direct payments to the Port or a partial refund of the PSR property purchase price, the critical point for purposes of

---

[21] In late-August 1994, shortly after entry of the PSR Consent Decree, the PSR Trust made two loans to PSR in the amounts of $1.4 million and $250,000, apparently funded by the Port's two option payments. Zeppetello Dec. at 82.  On October 17, 1994, immediately after the Port's acquisition of the PSR property, the PSR Trust made two additional loans to PSR totaling over $618,000, apparently funded by the sale proceeds paid by the Port.  *Id.*  In January and February 1995, the PSR Trust made five additional loans to PSR totaling over $1.7 million. *Id. See also id.* at 15 (PSR Trust allowed PSR to retain portion of proceeds in exchange for promissory notes).

[22] Outside the context of this litigation, the Port has conceded that the Prospective Purchaser Agreement gives it the right to recover the purchase price of the PSR property by submitting claims to the PSR Trust, and that this reimbursement right is capped at $ 9 million, as that is how much the Port paid for the property.  Adams Dec. at 123.

1  this motion is that, pursuant to the Supplemental AOC and Prospective Purchase Agreement, the

2  Port is entitled to reimbursement for 100% of the costs it has incurred in the marine sediments.

3  Moreover, the Port has in fact been reimbursed by the PSR Trust for all such EPA-approved costs

4  incurred to date and is entitled to 100% reimbursement for any reasonably foreseeable future

5  costs.  Therefore, to avoid an impermissible double recovery, the Port may not seek contribution

6  from BNSF for the same costs previously reimbursed to the Port by the PSR Trust.  *See Brink v.*

7  *Griffith*, 65 Wash.2d 253, 259 (1964) (although jury awarded separate sums for defamation and

8  invasion of privacy, plaintiff was not entitled to recover twice for the same elements of damages

9  growing out of the same occurrence); *Wilson v. Brand S. Corp.*, 27 Wash.App. 743, 747 (1980)

10  (where proper measure of damages was value of slate, plaintiff not also allowed damages on the

11  basis of lost profits because he would receive a double recovery, contrary to the principle of

12  compensatory damages).[23]

13  In addition to being precluded under Washington law, CERCLA expressly prohibits the

14  double recovery sought by the Port.  Specifically, CERCLA Section 114(b), 42 U.S.C. § 9614(b),

15  provides:

16  Any person who receives compensation for removal costs or damages or claims
pursuant to this chapter shall be precluded from recovering compensation for the same

17  removal costs or damages or claims pursuant to any other State or Federal law.  Any
person who receives compensation for removal costs or damages or claims pursuant to

18  any other Federal or State law shall be precluded from receiving compensation for the
same removal costs or damages or claims as provided in this chapter.

19  Courts have consistently applied this provision to preclude a party from recovering twice for the

20  same remedial action costs.  *See, e.g., Price v. U.S. Navy*, 39 F.3d 1011, 1014 (9th Cir. 1994)

21  (plaintiff awarded zero net recovery where she previously received payments from State as

22  reimbursement for cleanup costs and from settlement of her claims against another party); *Boeing*

23  *Co. v. Cascade Corp.*, 920 F.Supp. 1121, 1140 (D. Oregon 1996) (prohibition against double

24  recovery requires that settlement funds be factored into allocation of response costs), *aff'd as*

25

26

27  [23] *See also Town of Superior, Montana v. Asarco, Inc.*, 2004 U.S. Dist. LEXIS 26997 *30-*31
(D. Mont. 2004) (where the plaintiff has incurred no costs, and no costs are reasonably certain to

28  be incurred in the future, plaintiff has not stated a claim for damages).

*modified*, 207 F.3d 1177, 1189-90 (9th Cir. 2000).

CERCLA Section 114(b) may not directly bar the Port's MTCA claims, and MTCA does not contain a provision analogous to CERCLA Section 114(b) expressly prohibiting double recovery.  Nevertheless, as under CERCLA, preventing a party from recovering twice for the same remedial action costs is an appropriate equitable factor for this Court to apply under MTCA by holding that the Port has suffered no compensable damages in the marine sediments.  *See Western Properties Serv. Corp. v. Shell Oil Co.*, 358 F.3d 678, 691 (9th Cir. 2004) (in CERCLA contribution action, preventing double recovery for the same harm is one equitable factor); *Boeing*, 207 F.3d at 1189 (district court correctly noted that one equitable factor is preventing someone from recovering for the same harm twice); RCW 70.105D.080 (recovery shall be based on such equitable factors as the court determines are appropriate).

**C.   As A Matter Of Law BNSF Is Not Potentially Liable To The Port For Any  Remedial Action Costs Reimbursed By The PSR Trust**

The PSR Consent Decree resolved PSR's liability to the United States under CERCLA. Adams Dec. at 60-61 (¶33).  In requiring that all of PSR's assets, including the PSR property at the Plant, be liquidated and the proceeds disbursed to the PSR Trust, the Decree established a source of settlement funds to be used by EPA and the other trust beneficiaries for specified purposes, including but not limited to, environmental response actions at the PSR Superfund Site. Under both CERCLA and MTCA, BNSF cannot be liable for remedial action costs reimbursed to the Port, with EPA approval, from such settlement funds.

Specifically, CERCLA Sections 113(f)(2) and 122(g)(5), 42 U.S.C. §§ 9613(f)(2) and 9622(g)(5), each provide that, where a party has entered into a settlement with the United States, the settlement does not discharge the liability of any other potentially responsible party, "but it reduces the potential liability of the others by the amount of the settlement."[24]  Similarly, MTCA provides that where a party has entered a settlement with the state, the settlement does not

---

[24] CERCLA Section 113(f) governs contribution claims, including those asserted after a person has resolved its liability to the United States or a State in an administrative or judicially approved settlement.  CERCLA Section 122(g)(5) governs de minimis settlements.

discharge any other liable parties, "but it reduces the total potential liability of the others to the state by the amount of the settlement." RCW 70.105D.040(4)(d).

Under these provisions, even if BNSF may be potentially liable to the Port, which BNSF denies, it cannot be liable to the extent funds from PSR's settlement with EPA, held in the PSR Trust pursuant to the PSR Consent Decree, were used to reimburse remedial action costs incurred by the Port. *See United States v. Cannons Engineering Corp.*, 899 F.2d 79, 91-92 (1st Cir. 1990)(CERCLA § 113(f)(2)'s plain language requires settlement to result in dollar-for-dollar reduction of aggregate liability); *In Re Acushnet River & New Bedford Harbor*, 712 F.Supp. 1019, 1026-27 (D. Mass. 1989)(under CERCLA § 113(f)(2) the potential liability of others is reduced "by the amount of the settlement," not by the settlor's proportionate share of any damages). *O'Neil v. Picillo*, 682 F.Supp. 706, 729-30 (D.R.I. 1988)(under the express terms of CERCLA § 113(f)(2) the total liability of defendants must be reduced by the amount the state received in settlement from others), *aff'd*, 883 F.2d 176 (1st Cir. 1989), *cert denied*, 493 U.S. 1071 (1990).[25] Here, the Port has already received 100% reimbursement, from PSR's settlement with EPA, for the Port's expenditures in the marine sediments and, therefore, BNSF cannot be liable to the Port for the same costs.

In *United States v. Rohm & Haas Co.*, 721 F.Supp. 666 (D.N.J. 1989), a non-settling party objected to a proposed consent decree, which embodied a de minimis settlement, on the grounds that the decree would allow the United States a "double recovery" since it could recover from the non-settlor and the settling parties for the same costs. In rejecting this argument, the court explained:

. . . [CERCLA] Section 122(g)(5) leaves no room for a double recovery since the United States will not recover anything from non-settling defendants which it has already recovered from the settlors. *Rather, the most it may recovery from non-settlors is its total response costs minus any amounts recovered through settlements* (emphasis in original).

*Id.* at 700. Thus, CERCLA Sections 113(f)(2) and 122(g)(5), and RCW 70.105D.040(4)(d),

---

[25] *See also U.S. v. Burlington Northern R.R. Co.*, 200 F.3d 679, 698-99 (10th Cir. 1999)(where harm is geographically divisible, party is entitled to credit under CERCLA § 113(f)(2) only for the part of the settlement funds attributable to the property for which it is liable).

operate to preclude the double recovery sought by the Port here.  As in *Rohm & Haas*, the most

the Port can recover from BNSF is the total remedial action costs incurred by the Port in the

marine sediments minus any amounts reimbursed to the Port from the PSR Trust as a result of

PSR's settlement with EPA.  However, because the Port has been reimbursed for all such costs,

and is entitled to 100% reimbursement for any reasonably foreseeable future costs, it has suffered

no compensable damages in the marine sediments.

## VII.   CONCLUSION

For the foregoing reasons, BNSF submits there are no genuine issues of material fact and

asks this Court to enter summary judgment in its favor dismissing with prejudice each claim

alleged by the Port in Plaintiffs' Complaint.

DATED this 29th day of April, 2005.          Respectfully submitted,

BULLIVANT HOUSER BAILEY PC

/s/ Thomas D. Adams
Thomas D. Adams
WSBA #18470
E-mail: tom.adams@bullivant.com
Attorneys for Defendant, The Burlington Northern
and Santa Fe Railway Company
BULLIVANT HOUSER BAILEY PC
1601 Fifth Avenue
Suite 2300
Seattle, Washington  98101-1618
Telephone: 206.292.8930
Facsimile: 206.386.5130

BARG COFFIN LEWIS & TRAPP

/s/ Marc A. Zeppetello
John F. Barg, *Pro Hac Vice*
Marc A. Zeppetello, *Pro Hac Vice*
E-mail: maz@bcltlaw.com
Attorneys for Defendant, The Burlington Northern
and Santa Fe Railway Company
BARG COFFIN LEWIS & TRAPP, LLP
One Market – Steuart Tower, Suite 2700
San Francisco, CA  94105
Telephone: 415.228.5409
Facsimile: 415.228.5450

THE BNSF RAILWAY CO'S MOTION FOR SUMMARY JUDGMENT THAT THE PORT          24
OF SEATTLE HAS INCURRED NO COMPENSIBLE DAMAGES

## CERTIFICATE OF SERVICE

I hereby certify that on Friday, April 29, 2005, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the persons listed below:

Gillis E. Reavis
Foster Pepper & Shefelman PLLC
1111 Third Avenue, Ste 3400
Seattle, WA 98101
Phone:  (206) 447-7295
Fax:  (206) 749-2160
*Counsel for Plaintiff Pacific Sound/Port of Seattle*

Rodney L. Brown Jr.
Stephen J. Tan
David D. Dicks
Cascadia Law Group PLLC
1201 Third Ave., Ste. 320
Seattle, WA  98101
Phone:  (206) 292-6300
Fax:  (206) 292-6301
*Associated Counsel for Plaintiff Pacific Sound/Port of Seattle*

James C. Hanken
3210 Wells Fargo Center
999 Third Ave.
Seattle, WA  98104
Phone:  (206) 235-7679
Fax:  (206) 689-7999
*Counsel for Defendant JH Baxter & Co., and JH Baxter & Co., Inc.*

John F. Barg, *Pro Hac Vice*
Marc A. Zeppetello, *Pro Hac Vice*
Barg Coffin Lewis & Trapp, LLP
One Market Steuart Tower, Ste 2700
San Francisco, CA  94105-1475
Phone: (415) 228-5400
Fax:    (415) 228-5450
*Pro Hac Vice Counsel for Defendants The Burlington Northern and Santa Fe Railway Company*

BULLIVANT HOUSER BAILEY PC


By:/s/Debra A. Samuelson_____
          Debra A. Samuelson
          deb.samuelson@bullivant.com