UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC SOUND RESOURCES, *et al.,*

    Plaintiffs,

v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.*,

    Defendants.

Case No. C04-1654L

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

This matter comes before the Court on the "Motion for Summary Judgment that Plaintiff the Port of Seattle Has Incurred No Compensable Damages" (Dkt. # 25, the "Motion") filed by defendant, The Burlington Northern and Santa Fe Railway Co. ("BNSF"). For the reasons set forth below, BNSF's motion is granted.

## I. BACKGROUND

This dispute centers around the purchase and environmental cleanup of a wood treating plant (the "Plant") located in West Seattle, Washington. The Plant consists of approximately 22 acres of property on the shore of Elliott Bay near the Duwamish River. The Plant became contaminated with hazardous substances after nearly a century of wood-treating operations. The hazardous substances migrated from the Plant into adjacent properties and into state owned aquatic lands and sediments in Elliott Bay.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1    Plaintiffs Pacific Sound Resources ("PSR") and the Port of Seattle (the "Port") seek
2 contribution under Washington's Model Toxics Control Act ("MTCA"), RCW 70.105D.80,
3 from defendants for expenses incurred in the cleanup of marine areas adjacent to the Plant.
4 Plaintiffs also seek a declaratory judgment asserting that defendants are jointly and severally
5 liable for cleanup costs of the marine areas as well as damages based on common-law theories of
6 negligence, nuisance, and trespass.

7    In its Motion, BNSF argues that the claim for contribution under the MTCA asserted by
8 the Port should be dismissed.  BNSF argues that the Port has incurred no compensable damages
9 because it has been reimbursed for all of the remedial cleanup costs at issue in this action.  The
10 Port argues that summary judgment is not appropriate because material issues of fact exist
11 regarding whether it has already obtained contribution and because the equitable distribution of
12 environmental cleanup costs required under the MTCA cannot be determined on summary
13 judgment.  Resolution of this dispute requires a discussion of the circumstances surrounding the
14 transfer of the Plant from PSR to the Port.

15    The following facts are not in dispute. From December 1965 to August 1994, PSR and
16 its corporate predecessors owned and conducted wood-treating operations at the Plant.  The
17 Environmental Protection Agency ("EPA") began investigating the Plant in the 1980s.  After
18 nearly a decade of working with PSR to clean up the Plant, EPA took over the cleanup of the
19 contaminated properties in May, 1994, and placed the Plant and adjacent properties on the
20 National Priorities List of Superfund sites (the "West Seattle Site").  The West Seattle Site
21 included the Plant and the surrounding areal extent of contamination.  The EPA separated the
22 West Seattle Site into two "operable units."  The "Uplands Unit" included the Plant.  The
23 "Marine Sediments Unit" included the submerged properties in and adjacent to Elliott Bay.

24    In early 1990, the Port became interested in acquiring the Plant in connection with its
25 Southwest Harbor Cleanup and Redevelopment Project ("the SW Harbor Project").  Under the
26 SW Harbor Project, the Port intended to enlarge and modernize the container shipping facility

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

referred to as Terminal Five. The Port had negotiated a cargo shipping lease with American President Lines ("APL"), a major shipping company. The Port considered redevelopment and use of the Plant for container storage, other vessel cargo activities, and public access as a critical part of the SW Harbor Project, and extremely important to the economy of the region.

The Port, however, was reluctant to purchase the Plant because of the environmental liability associated with it. As a result, the Port began negotiating both with PSR regarding the purchase of the Plant and with the EPA to determine the specific remedial actions the Port could implement in return for a release of all further environmental liability. These protracted negotiations occurred as PSR faced environmental cleanup liability for both the West Seattle Site and a second facility located on Bainbridge Island that had also been registered as a superfund site (the "Eagle Harbor Site"). The EPA, the Suquamish Tribe, and the Muckleshoot Indian Tribe (together, the "CERCLA Plaintiffs") filed a complaint against PSR and individual defendants seeking damages under CERCLA[1] relating to environmental contamination at both the West Seattle and Eagle Harbor Sites. Consequently, PSR entered into settlement negotiations with the CERCLA Plaintiffs.

These multi-party negotiations resulted in the execution of four different agreements. The first of these agreements is the Agreement for Option to Purchase and for Purchase and Sale of Real Estate (the "Purchase Agreement") entered into by the Port and PSR on November 24, 1993. Under the terms of the Purchase Agreement, the Port payed $1.4 million for the option to purchase the Plant. The parties agreed that the purchase price for the Plant would be $9 million and stated that the $1.4 million option would be credited against the purchase price if the Port exercised its option to buy the Plant. The Purchase Agreement recognized PSR's ongoing negotiations of a consent decree with the EPA as well as the Port's negotiations with the EPA

---

[1] The Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, ("CERCLA"), 42 U.S.C. §§ 9606 & 9607.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

-3-

regarding the acquisition of the Plant subject to a plan to remediate environmental damage.  The Port conditioned its purchase on the entry of the consent decree and upon the execution of an agreement between the Port and the EPA that would resolve the Port's liability for any environmental cleanup.  The Purchase Agreement was binding on the Port and PSR, as well as their successors.  The Port exercised its option and paid PSR $1.4 million which, in keeping with the terms of the Purchase Agreement, was immediately dispersed to PSR's creditors.

In August 1994, this Court entered a Consent Decree negotiated among the CERCLA Plaintiffs, PSR and the individual defendants.  Under the terms of the Consent Decree, the shareholders of PSR agreed to transfer all of their shares to the Pacific Sound Resources Environmental Trust (the "PSR Trust").  PSR would, accordingly, dissolve into the PSR Trust, and all of its assets were to be liquidated according to an agreed upon liquidation plan.  The beneficiaries of the PSR Trust were the United States, the Suquamish Tribe, and the Muckleshoot Indian Tribe.  The accompanying liquidation plan required the PSR Trust to use the proceeds first to pay necessary expenses, then to pay PSR's creditors.  The remaining proceeds were to be split evenly between the United States Hazardous Substance Superfund Trust and an account established by the Consent Decree.

In September 1994 the EPA and the Port entered into an Agreement and Covenant Not to Sue Re PSR Superfund Site (the "EPA Covenant").  Under the EPA Covenant, the EPA acknowledged that the Plant would not be transferred to the PSR Trust, but would be sold directly to the Port by PSR.  In consideration for the acquisition of the Plant, the Port agreed to pay $9 million directly to the PSR Trust. Dkt. # 34, Decl. of Gillis R. Reavis ("Reavis Decl.") at p. 70, ¶ 5.3.  In addition, the Port agreed to provide "in-kind consideration" of $7.2 million.  This in-kind consideration would be paid by the Port through its environmental cleanup efforts at the Plant.  Since the Port intended to prepare the site for use as a cargo loading facility for vessels, the parties recognized that some of the activities at the site would be for environmental cleanup and some for property improvement.  The Port and the EPA agreed that for every dollar

the Port spent, it would receive 75 cents credit to its in-kind contribution requirement.

Once the Port had paid its in-kind contribution, the EPA Covenant anticipated that the Port would be reimbursed from the PSR Environmental Trust for its additional cleanup costs. The parties agreed that the Port could obtain up to the $9 million it had paid to the PSR Trust as reimbursement for its cleanup costs, upon the submission of invoices describing the activities performed and the costs incurred. The Port agreed that it would not look to the PSR Trust for reimbursement in excess of $9 million, but the Port reserved the right to present its claims to the Hazardous Substance Superfund for reimbursement of environmental response costs expended to implement the EPA Covenant over and above the $9 million purchase price and $7.2 million in-kind contribution. The Port also reserved the right to seek contribution for all environmental response costs from any responsible third parties.

Under CERCLA, the Port could have become liable as a potentially responsible party for contamination at the Plant. The EPA Covenant freed it from liability for response costs for cleaning up the Plant. Under the terms of the EPA Covenant, the Port also assumed no liability for the Marine Sediments Unit, which was not part of the Plant but is part of the West Seattle Site. The Marine Sediments Unit consists of properties owned by Washington's Department of Natural Resources ("DNR") and it was recognized that contamination from PSR's wood-treatment facilities had come to rest on these properties, as well.

In September, 1994 the EPA and the Port entered into a second agreement entitled "Administrative Order on Consent Re Pacific Sound Resources Superfund Sites" (the "AOC"). The AOC governed the performance of environmental response activities entered into by the Port at the West Seattle Site. The AOC recognized that the Port was not a responsible party under CERCLA, but had agreed to undertake all actions required under the AOC. The AOC recognized that under the EPA Covenant the Port would perform up to $16.2 worth of environmental response activities. The AOC identified a number of tasks that the Port was required to complete and, together with an attached Statement of Work, listed six additional

1  tasks to be performed by the Port.

2      By June, 1998, the Port had completed the remedial tasks set forth in the AOC. It had
3  satisfied its $7.2 million in-kind contribution requirement under the EPA Covenant, but had not
4  exhausted the $9 million of PSR Trust funds from which it could seek reimbursement.

5      In September 1999, the EPA issued a Record of Decision ("ROD") in which it reported
6  on its proposed remedies for the Upland Unit and Marine Sediments Unit of the Superfund Site.
7  With regard to the Upland Unit, which mainly consisted of the Plant, the EPA determined that
8  the remedial actions taken according to the agreements between the Port and the EPA had
9  eliminated the risks posed by exposure to contaminated soil and groundwater. The ROD
10 determined that no additional remedial measures were necessary. With regard to the Marine
11 Sediments Unit, the EPA proposed that (1) a cap of clean material be placed over a portion of
12 the contaminated sediments; (2) approximately 3,500 cubic yards of sediments be dredged for
13 navigational purposes; and (3) unused pilings be removed.

14     In December 2002, the Port and EPA entered into a Supplemental Administrative Order
15 on Consent Re PSR Superfund Site ("Supplemental AOC"). According to the terms of the AOC,
16 the Port assumed no liability for the DNR properties that constituted the Marine Sediments Unit
17 of the Superfund Site. Nevertheless, in the Supplemental AOC the Port agreed to perform
18 additional environmental response actions in keeping with the ROD's determinations. The
19 additional response actions were to be covered by the same terms and conditions as the AOC,
20 that is, the Port was to seek reimbursement for its costs from the remaining money in the PSR
21 Trust. For the work done under the Supplemental AOC, the Port was to receive 100 percent
22 reimbursement, rather than the previous 75 cents on the dollar, for the costs incurred. The Port
23 incurred reimbursement for its cleanup efforts of at least $499,985. Those reimbursements were
24 authorized by the EPA and paid by the PSR Trust. The Port now seeks contribution from BNSF
25 for the cleanup costs associated with the work performed under the Supplemental AOC.

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

## II.  DISCUSSION

**A.     Summary Judgment Standard of Review.**

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A court must construe all facts in favor of the party opposing summary judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving party has demonstrated the absence of a genuine issue of fact as to one or more of the essential elements of a claim or defense, the opposing party must make an affirmative showing on all matters placed at issue by the motion as to which the opposing party has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a situation Fed. R. Civ. P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

**B.     Has the Port Already Been Compensated for Cleanup of the Marine Sediments Unit?**

The parties agree that under the Supplemental AOC, the Port was reimbursed from the PSR Trust for all costs incurred for its cleanup of the Marine Sediments Unit.  BNSF argues that because of this reimbursement any amounts awarded through this lawsuit would constitute an impermissible double recovery.  The Port, for its part, argues that it was not compensated through the PSR Trust reimbursement because, in essence, the reimbursement merely returned to the Port the money that the Port had placed into the PSR Trust for the purpose of conducting environmental cleanup.  Since, the Port contends, the money was the Port's to begin with, it argues that no double recovery has occurred here.

To resolve this dispute, the Court must turn to the terms of the agreements among the Port, PSR, and the EPA. The parties agree that the terms of the agreements, including the Court-imposed Consent Decree, must be construed according to Washington law. See e.g. Thompson v. Enomoto, 915 F.2d 1383, 1388 (9th Cir. 1990) (in interpreting a consent decree, the Court must apply general contract principles using the law of the state where the agreements were made); Collins v. Thompson, 8 F.3d 657, 659 (9th Cir. 1993) (holding that consent decrees are interpreted using contract principles), cert denied, 511 U.S. 1127 (1994).

Washington courts have adopted the "context rule" of contract interpretation, which allows "a court to look to extrinsic evidence to discern the meaning or intent of words or terms used by contracting parties, even when the parties' words appear to the court to be clear and unambiguous." Hollis v. Garwall, Inc., 137 Wn.2d 683, 693 (1999) (citing Berg v. Hudesman, 115 Wn.2d 657, 668-69 (1990)). The use of extrinsic evidence is not wholly unrestricted, however. The Washington Supreme Court recently reaffirmed that even under the context rule the parties' intent is determined "by focusing on the objective manifestation of the agreement, rather than on the unexpressed subjective intent of the parties. . . . Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used." Hearst Communications, Inc. v. Seattle Times Co., 154 Wn.2d 493, 503-504 (2005). The circumstances surrounding the formation of a contract and other extrinsic evidence may be used "'to determine the meaning of *specific words and terms used*'" but not to "'show an intention independent of the instrument' or to 'vary, contradict or modify the written word.'" Id. at 17 (emphasis in original) (quoting Hollis v. Garwall, Inc., 137 Wn.2d at 695-96).

Applying these principles to the agreements executed among the Port, PSR, and the EPA, makes it clear that the $9 million transferred from the Port to the PSR Trust was a payment in exchange for the purchase of the Plant. Although the $9 million may have been earmarked to reimburse the Port for its cleanup activities, that does not alter the undisputed fact that the Port

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  agreed to pay $9 million for the Plant and, with the transfer of the money to the PSR Trust,
2  satisfied its agreement.

3        The parties do not dispute that, according to the terms of the Purchase Agreement, "[t]he
4  purchase price of the [Plant] shall be $9,000,000." Reavis Decl. at p. 148, ¶ 2.  There is no
5  dispute that the Port exercised its option under the Purchase Agreement and that the Port
6  purchased the Plant from PSR.  The Port, however, attempts to sidestep the plain meaning of the
7  Purchase Agreement by pointing to the context in which the document was executed.  The
8  context of these agreements, the Port contends, creates a legitimate question of fact regarding
9  whether the $9 million was transferred to the PSR Trust as payment for the Plant.

10       Viewing the Purchase Agreement in context with the other agreements, however, does not
11 create a legitimate question of fact.  To the contrary, the context makes it clear that the Purchase
12 Agreement meant what it said:  the Port paid $9 million to purchase the Plant.  The Consent
13 Decree, for instance, anticipates that the purchase of the Plant will be governed by the terms of
14 the Purchase Agreement.  In discussing the sale of PSR's real property, the Consent Decree
15 defers to the attached and incorporated Liquidation Plan.  Reavis Decl. at p. 27, ¶ 29.  The
16 Liquidation Plan states that "[t]he parties to the Consent Decree of which this Liquidation Plan
17 is a part contemplate that the real estate upon which PSR operates a woodtreating plant at West
18 Seattle will be acquired by the Port of Seattle pursuant to the terms of [the Purchase Agreement]
19 to be negotiated between PSR and the Port." Id. at p. 56, ¶ 7(a).  The terms of the Consent
20 Decree provide no occasion to doubt or re-interpret the language of the Purchase Agreement.

21       Similarly, the EPA Covenant affirms the conclusion that the $9 million paid into the PSR
22 Trust by the Port was for the purchase of the Plant.  The EPA Covenant indicates that the parties
23 intend the Plant to be sold by PSR to the Port "in accordance with the terms of the consent
24 decree." Id. at 69-70, ¶ 5.3.  The AOC, executed on the same day as the EPA Covenant,
25 contains nearly identical language.  See id. at 93, ¶ 16.  As noted above, the Consent Decree
26 asserts that the Plant will be purchased by the Port according to the terms of the Purchase

1 Agreement.

2      The Port makes two arguments to support its claim that a legitimate question of fact exists
3 regarding whether the $9 million transferred to the PSR Trust was a payment for property, or a
4 deposit of its own money for future withdrawals. First, the Port notes that the Plant was
5 appraised as worth $8 million without considering the costs of environmental cleanup. The
6 environmental clean up, in turn, was estimated as costing between $40 and $50 million. Based
7 on these numbers, the Port argues that to find that it paid $9 million for the Plant "depends on
8 the illogical analysis that the Port paid $9 million for a worthless piece of property." Dkt. # 32,
9 Opp. at p. 11. Washington courts, however, are generally unwilling to inquire into the adequacy
10 of consideration. See Labriola v. Pollard Group, Inc., 152 Wn.2d 828, 834 (2004) (citing
11 Browning v. Johnson, 70 Wn.2d 145, 147 (1967)). Instead of looking at "the comparative value
12 of the promises and acts exchanged," Washington courts ask whether the consideration is legally
13 "sufficient." Browning, 70 Wn.2d at 147.

14      The context of these agreements makes it clear that the exchange of the Plant for the $9
15 million payment was legally sufficient. The Port intended to use the Plant to expand the
16 shipping cargo and container storage capacity as part of its SW Harbor Project. The Port
17 acknowledged that "[r]edevelopment and use of the [Plant] by the Port and its tenants for
18 container storage, other vessel cargo activities, and public access . . . is extremely important to
19 the Port and the economy of the region." Reavis Decl. at pp. 73-74, ¶ 8.2. As the Port
20 concedes, it "would not have acquired the highly contaminated [Plant] had it not been
21 absolutely necessary for the completion of the [Southwest Harbor Project]." Dkt. # 35, Decl. of
22 Thomas A. Newlon at p. 2, ¶ 8. Under the circumstances, there is no question that the Plant was
23 sufficient consideration for the $9 million payment.[2]

---

25     [2]Not only was the location of the Plant significant, the timing of the acquisition mattered
26 as well. The Port does not dispute that the leasing contract with APL required the Port to

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

-10-

1       Second, the Port argues that the $9 million was paid to the PSR Trust in consideration for
2   the EPA Covenant, not for the purchase of the Plant. Although the Port is correct that the $9
3   million placed into the PSR Trust comprised a portion of the consideration for the EPA
4   Covenant, that does not mean that the $9 million was not also the consideration for the purchase
5   of the Plant. The Port's characterization ignores the plain meaning of the Purchase Agreement
6   and, what is more, ignores the statements in the EPA Covenant recognizing that the $9 million to
7   be paid to the PSR Trust was for the purchase of the Plant. For instance, the EPA Covenant
8   states that $9 million to be paid by the Port includes "payments made into options and escrow by
9   the Port prior to the closing of the purchase and sale agreement for the PSR property." EPA
10  Covenant at ¶ 11.1. This is entirely consistent with the terms of the Purchase Agreement, which
11  asserted that the option price and other expenses would be deducted from the $9 million
12  purchase price. It is also consistent with what actually occurred. The Port only placed $7.3
13  million into the PSR Trust. See Dkt. # 27, Decl. of Marc A. Zeppetello at p. 10, 12-13. This
14  amount satisfied the Port's obligations under the Purchase Agreement once the option fee and
15  other costs had been subtracted from the $9 million total.

16      The Port argues that it had always considered the $9 million as its own money deposited
17  with the PSR Trust, not as money that it paid for the Plant that was then part of the
18  reimbursement pool. The plain language of the agreements, however, does not support this
19  contention, and the Port's subjective beliefs regarding the money are irrelevant to determining
20  the meaning of the agreements. See Hearst, 154 Wn.2d at 503-504. In any event, this belief is

21  ───────────────

22  provide it with constructed shipping facilities by a specific date or face $17,000.00 per day in
23  penalties. See Reavis Decl. at p. 164. As the Port acknowledged, "the redevelopment efforts
    designed to expand container shipping facilities . . . are extremely time sensitive. The Port
24  cannot wait the many years that would normally be required for EPA to completely clean up the
25  site and make it available for productive economic use." Dkt. # 26, Decl. of Thomas D. Adams
    at p. 114. Thus, it appears as if the Port also paid a premium to obtain the Plant in time to
26  satisfy its obligations under the APL lease.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

-11-

1  belied by documents and statements made at or near the time the agreements were executed.  For
2  instance, PSR's 1994 tax return indicates that it claimed the $9 million as the proceeds from the
3  sale of its property.  In addition, in a June 22, 1994 letter to the Department of Justice, the Port
4  indicated that it would "pay the [PSR] Trust for title to the property." Adams Decl. at p. 114.
5  More recent statements from the Port echo this understanding.  In October 8, 2002, the Port
6  asserted that the EPA Covenant "required the Port to acquire the PSR property for a purchase
7  price of $9 million as delineated in the [Purchase Agreement]. . . ." Adams Decl. at p. 122.

8    Because the $9 million paid to the PSR Trust constituted consideration for the acquisition
9  of the Plant, that money became the property of the PSR Trust upon the completion of the
10 transaction.  Although the Port may have been reimbursed for its cleanup activities from the
11 same pool of money, the money did not belong to the Port.  The payments from the PSR Trust to
12 the Port for its cleanup of the Marine Sediments Unit are properly construed as contributions
13 from the PSR Trust used to reimburse the Port for its environmental cleanup costs.  Both the
14 terms of the agreements and the context in which they were executed indicate that the Port has
15 been fully compensated by the PSR Trust for the costs incurred in cleaning up the Marine
16 Sediments Unit.

17 **C.    Contribution under MTCA.**

18    Under the MTCA, a party may file a claim "for the recovery of remedial action costs" it
19 has incurred.  RCW 70.105D.080.  Any recovery of costs incurred "shall be based on such
20 equitable factors as the court determines are appropriate." Id.  The Port argues that, even
21 assuming that this Court finds that it has been fully reimbursed for its cleanup expenses,
22 summary judgment is not appropriate because the Court must consider equitable factors, which
23 are inherently fact-based, in allocating contribution claims.  The Port, however, ignores the fact
24 that a "party seeking contribution bears the burden of establishing its entitlement to
25 contribution." City v. Washington State Dep't of Transp., 98 Wn. App. 165, 175 (1999).  Here,
26 the Port is not entitled to contribution because it has failed to show that there are any costs it has

1 incurred that have not already been recouped. Indeed, the Port acknowledges that it has been
2 fully reimbursed for its expenses in cleaning up the Marine Sediments Unit. Put simply, since
3 the Port cannot identify any costs to recoup, it is not entitled to contribution.

4      Furthermore, because the Port has already recouped its costs, any contribution by BNSF
5 would amount to a double recovery. Although the MTCA does not contain an explicit ban on
6 double recovery, Washington courts prohibit such a windfall. See <u>Seafirst Ctr. Ltd. Partnership</u>
7 <u>v. Erickson</u>, 127 Wn.2d 355, 365 (1995) (the law does not sanction double recovery); <u>Brink v.</u>
8 <u>Griffith</u>, 65 Wn.2d 253, 259 (1964) (plaintiff not allowed to recover twice for same elements of
9 damages arising from the same occurrence); <u>Eagle Point Condo. Owners Ass'n v. Coy</u>, 102 Wn.
10 App. 697, 702 (2000) (basic principle of damages is that there shall be no double recovery for
11 the same injury); <u>Barney v. Safeco Ins. Co. of Am.</u>, 73 Wn. App. 426, 428 (1994) (applicable
12 measure of damages is public policy with respect to recovery; double recovery violates public
13 policy), <u>overruled on other grounds by Price v. Farmers Ins. Co. of Wash.</u>, 133 Wn.2d 490
14 (1997); <u>Pannell v. Food Servs. of Am.</u>, 61 Wn. App. 418, 444-45 (1991) (plaintiffs' employment
15 discrimination action damages for front pay were duplicative as a matter of law to damages for
16 lost business opportunity); <u>Wilson v. Brand S Corp.</u>, 27 Wn. App. 743, 747 (1980) (double
17 recovery is contrary to the principle of compensatory damages); <u>Kammerer v. W. Gear Corp.</u>, 27
18 Wn. App. 512, 526-27 (1980) (award of damages for fraudulently inducing contract and breach
19 of same contract was improperly duplicative), <u>aff'd</u>, 96 Wn.2d 416 (1981). There is no question
20 that Washington's limitation against double recovery of compensatory damages would apply to
21 contribution claims under the MTCA.

22
23
24
25
26

## III.  CONCLUSION

Based on the foregoing, the Motion for Summary Judgment that Plaintiff the Port of Seattle Has Incurred No Compensable Damages" (Dkt. # 25) filed by BNSF is GRANTED.

DATED this 17th day of August, 2005.

*/s/ Robert S. Lasnik*
Robert S. Lasnik
United States District Judge