1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

PACIFIC SOUND RESOURCES, *et al.,*

10

Plaintiffs,

Case No.  C04-1654L

11

v.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

12

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.*,

13

Defendants.

14

15

16

This matter comes before the Court on "Defendant BNSF Railway Company's Motion

17

for Summary Judgment that Plaintiff Pacific Sound Resources has Incurred No Remedial Action

18

Costs Under MTCA and Lacks Standing to Seek Contribution or Damages and that PSR's

19

Common Law Claims are Time Barred" (Dkt. # 41, "the motion") filed by defendant, The

20

Burlington Northern and Santa Fe Railway Co. ("BNSF").  For the reasons set forth below,

21

BNSF's motion is granted.[1]

22

**I.  BACKGROUND**

23

Much of the factual background of this case has been set forth in the Court's previous

24

order granting summary judgment to BNSF on the claims of the Port of Seattle (Dkt. # 38).

25

26

[1] Because the Court finds that this matter can be decided on the parties' memoranda,
declarations, and exhibits, plaintiff's request for oral argument is denied.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  Only the key facts are recited here.  Pacific Sound Resources ("PSR") is the successor in every

2  respect of the Wyckoff Company ("Wyckoff"), which operated wood treating facilities on

3  Bainbridge Island and in West Seattle, both of which the Environmental Protection Agency

4  ("EPA") placed on the National Priorities List of Superfund sites (respectively, "the Eagle

5  Harbor site" and "the West Seattle site").

6        In 1985, the company, its president and several of its employees entered into plea

7  agreements with the government for criminal violations of the Clean Water Act ("the CWA"), 33

8  U.S.C. § 1319, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928.

9  Adams Decl. at 69–74.  Wyckoff and EPA agreed to an administrative order in September, 1987,

10  pursuant to RCRA and the Comprehensive Response Compensation and Liability Act

11  ("CERCLA"), 42 U.S.C. § 9606, which required Wyckoff to perform certain investigative and

12  remedial actions at the West Seattle site.  Adams Decl. at 91–92.  After determining Wyckoff's

13  action to be insufficient, the EPA issued a unilateral administrative order with several additional

14  demands on January 9, 1990.  Id. at 75.

15        On March 29, 1990, Wyckoff replied to that order in a letter to EPA, arguing that strict

16  compliance would force the plant to close its doors, declare bankruptcy, and cease all of its

17  remedial environmental efforts.  Id. at 95–104.  Wyckoff's lawyers suggested that, instead, the

18  company be allowed to continue operations and dedicate all of its budget to clean up efforts as it

19  pursued a sale of the property to the Port of Seattle ("the Port").  For the remaining shareholders

20  to consent to this plan of action, however, the government would have to agree not to hold them

21  personally liable.

22        Although EPA did not agree to this exact approach, multi-party negotiations soon

23  commenced between EPA, the Suquamish and Muckleshoot Indian Tribes (together, the

24  "CERCLA plaintiffs"), PSR and the Port.  On November 24, 1993, the Port and PSR arrived at a

25  purchase agreement conditioned on the result of the ongoing negotiations with EPA to secure a

26  consent decree and to resolve the Port's liability for environmental remediation.  The consent

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   decree was lodged with this Court in May, 1994 and entered in August, 1994.  See id. at 35–57

2   (hereinafter the consent decree will be referred to using its internal page numbers).

3       As a part of the consent decree, all of the assets and resources of PSR were liquidated and

4   the proceeds from the liquidation were to benefit a new entity - the Pacific Sound Resources

5   Environmental Trust ("the trust"), the beneficiaries of which were the CERCLA plaintiffs.

6   Consent Decree at 16.  As part of this agreement, individual settling defendants Tom Wyckoff,

7   Margo Wyckoff and Susan Wyckoff Mullen transferred their shares, ownership rights and

8   interests in PSR to the trust.  Id.  Also, individual settling defendants Charles and Susan Mullen

9   resigned as directors of PSR and Charles Mullen also resigned as its secretary.  Id.  Individual

10  settling defendant Ted DePriest, PSR's president, agreed to become the sole employee of the

11  trust.  Id. at 15.

12      The parties agreed that the "assets and resources of PSR shall be liquidated and the

13  proceeds therefrom shall be disbursed by the Environmental Trust pursuant to the Liquidation

14  Plan.  Such proceeds from this liquidation which are exclusively for the benefit of Plaintiffs

15  shall be paid as follows: One half into the United States Substance Superfund Trust ("the fund")

16  in the manner set forth below, and the other one-half into the registry of this court, as set forth in

17  the Liquidation Plan, and in accordance with the Memorandum of Agreement [which] was

18  entered into by the Plaintiffs to ensure that settlement proceeds would be applied toward both

19  environmental response and natural resource restoration goals."  Id.  at 16–17.

20      In exchange for the defendants' cooperation in this regard, the CERCLA plaintiffs agreed

21  not to file any civil or administrative actions against the defendants.[2]  Id. at 25–26.  Further, the

22

23

24      [2] Plaintiff correctly point out that the entity PSR is not listed in the paragraph indicating
    which of the defendants were not to be subject to civil or administrative actions.  However, PSR
25  was also understood to be liquidated by the agreement, Consent Decree at 3, and also explicitly
    refused to admit liability in the agreement, id. at 2–3, so plaintiff's statement that PSR "is
26  therefore still liable," Response at 17, is dubious.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  CERCLA plaintiffs agreed to settle their litigation "without admission of liability by Settling

2  Defendants." Id. at 2–3.

3                                    **II.  DISCUSSION**

4  **A.      Standard of Review**

5          Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

6  and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

7  to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

8  R. Civ. P. 56(c).  A court must construe all facts in favor of the party opposing summary

9  judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving

10  party has demonstrated the absence of a genuine issue of fact as to one or more of the essential

11  elements of a claim or defense, the opposing party must make an affirmative showing on all

12  matters placed at issue by the motion as to which the opposing party has the burden of proof at

13  trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a situation, Fed. R. Civ.

14  P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or

15  by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts

16  showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)); see

17  also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)

18  ("When the moving party has carried its burden under Rule 56(c), its opponent must do more

19  than simply show that there is some metaphysical doubt as to the material facts.").

20  **B.      MTCA Claims**

21          PSR seeks contribution from BNSF under Washington's Model Toxics Control Act

22  ("MTCA"), which states:

23          Except as provided in RCW 70.105D.040(4)(d) and (f), a person may bring a
            private right of action, including a claim for contribution or for declaratory relief,
24          against any other person liable under RCW 70.105D.040 for the recovery of
            remedial action costs.

25
    RCW 70.105D.080.  PSR argues that the plain meaning of the statute authorizes anyone that has
26

    ORDER GRANTING MOTION FOR
    SUMMARY JUDGMENT

1  paid funds to support remedial actions as defined by the MTCA to seek contribution, pursuant to

2  equitable considerations, from any party that is liable for the harm caused.

3      BNSF disputes that this provision was intended to be used in the manner proposed by

4  PSR.  Most importantly, BNSF argues, PSR itself did not actually incur any remedial action

5  costs to bring it within the purview of the statute.  Rather, it was liquidated to form the trust

6  which, for the most part, paid EPA to conduct remedial activities.  For similar reasons, PSR also

7  lacks standing under Article III of the Constitution.  First, it has not suffered an injury that is

8  traceable to any wrongdoing by BNSF.  Second, because the remedy it seeks in the instant suit

9  would, in accordance with the Consent Decree, be paid directly into the trust, no conceivable

10 injury would be redressed by BNSF's payment.

11 *1.      Remedial Action Costs Under RCW 70.105D.080*

12     The Court finds that the term "remedial action costs" for the purpose of this statute

13 encompasses contributions to an environmental trust if the sole purpose of that trust is to

14 distribute the funds to a specific environmental clean up effort.  The Washington Department of

15 Ecology ("Ecology" or "the department") has broadly construed the definition of "remedial

16 action costs" for the purpose of the private right of action statute.  See WAC 173-340-545.  That

17 regulation provides that remedial action costs include those costs that are expended on an action

18 that "has been or is being conducted under an order or decree and the remedial requirements of

19 the order or decree."  WAC 173-340-545(2)(b).  Moreover, the regulations generally evince an

20 intent to construe the statute broadly.

21     PSR's protestations that BNSF's interpretation of the private right of action statute limits

22 recovery to "only the costs of work performed personally by the plaintiff" are somewhat

23 exaggerated.  Response at 5.  BNSF is correct that in a typical contribution action, the

24 organization seeking recovery will have taken the lead in organizing, directing and funding the

25 contractors who perform the direct environmental clean up efforts.  See, e.g., Cooper Indus., Inc.

26 v. Aviall Servs., Inc., 543 U.S. 157 (2004).  In the instant case, PSR contributed to an

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  organization that then performed these functions independently.  However, the funds paid to the

2  environmental trust were intended for a specific environmental clean up effort.  The trust acts

3  merely as a bureaucratic "middle man" to manage the proceeds from the PSR liquidation and

4  coordinate the expenditure of those funds at the sites.

5        BNSF's approach would require elaborate inquiries into the path of remedial action funds

6  from a liable party.  This would interfere with the efficient coordination of environmental clean

7  up efforts, as courts and contributing parties might be concerned that the use of an entity to

8  manage funds and clean up efforts might create a roadblock to post-hoc private actions for

9  contributions.  For the Court to interpret the private cause of action statute as BNSF suggests

10 would therefore frustrate the intent of the drafters of the law.  PSR's payment of funds to the

11 trust for the purpose of environmental clean up at the West Seattle site constitute "remedial

12 actions costs" within the purview of RCW 70.105D.080.

13 2.      *Standing to Seek Contribution: Injury and Causation*

14       In order to pursue its private cause of action against BNSF, PSR must have standing

15 under Article III of the Constitution.  U.S. CONST. art. III, § 2.  The Supreme Court has provided

16 a three-part test to determine standing.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555,

17 560–61 (1992).  The first two elements are that "the plaintiff must have suffered an 'injury in

18 fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b)

19 actual or imminent, not 'conjectural' or 'hypothetical,'" and "there must be a causal connection

20 between the injury and the conduct complained of--the injury has to be 'fairly . . . trace[able] to

21 the challenged action of the defendant, and not . . . th[e] result [of] the independent action of

22 some third party not before the court.'"  Id. (internal quotations and citations omitted).

23       The CERCLA action against PSR began in the early 1980s.  After some stalling, PSR

24 ultimately sought to wash its hands of all responsibility for the cleanup of the West Seattle site.

25 As is clear from the documentation presented by the parties, the individual shareholders and

26 directors of PSR perceived their potential corporate and personal liability for this environmental

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  crisis as so severe that they traded any and all value of the company in exchange for immunity

2  from suit.  PSR's directors and shareholders assessed the cost of cleanup for their environmental

3  harms to be so far higher than the value of the company that they readily divested themselves of

4  their stake in the company in exchange for the guarantee that their personal fortunes would not

5  be pursued.  The harm for which PSR now seeks contribution, then, is the decision to enter into

6  the consent decree and liquidate the company.  PSR has incurred costs by contributing to a trust

7  that works to clean up the site, and these costs are mandated by the consent decree.  This

8  constitutes a "concrete and particularized" injury.

9       This injury was caused by the directors' and company's assessment of their own potential

10 liability for the environmental harm.  Nonetheless, BNSF's alleged pollution played a role in

11 causing this injury.  Because PSR would be held jointly and severally liable for the entire

12 environmental injury to the West Seattle site, the pollution caused by BNSF would figure into its

13 assessment of its capacity to pay for the damages and continue its business operations.  See 42

14 U.S.C. § 9607(a)(4) (describing joint and several liability under CERCLA).  Because PSR faced

15 increased expense due to BNSF's alleged pollution, it can be concluded that BNSF may have

16 caused, at least in part, the injury to PSR.

17 *3.     Standing to Seek Contribution: Redressability*

18      The final element of Article III standing is that "it must be 'likely,' as opposed to merely

19 'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at

20 561.  Although "[t]here is a close relation between the requirement of power to redress a claimed

21 injury and the requirement of a causal link between the injury asserted and the relief claimed[,

22 t]he two requirements . . . do diverge." Gonzales v. Gorsuch, 688 F.2d 1263 (9th Cir. 1982).

23 PSR does not seek a release from its obligation pursuant to the consent decree to disburse the

24 proceeds from the liquidation of "[a]ll assets and resources of PSR" into the trust.  Consent

25 Decree at 16.  Instead, PSR seeks "an award of monetary damages to reimburse it for BNSF's

26 equitable share of liability [and] a declaratory judgment for costs that may be required in the

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   future."  Response at 14.

2       PSR seems to concede that it will be obligated to provide to the environmental trust any

3   proceeds from the instant litigation.  Response at 17 ("PSR and PSR Environmental Trust were

4   instructed to use 'best efforts' to '[m]aximize the amount of funds paid into the Fund and the

5   registry of this court, consistent with this Consent Decree.'  The Consent Decree recognizes that

6   PSR would pursue contribution claims that it had against any other Potentially Responsible

7   Parties.") (citations omitted).  Because the benefit of the remedy available to PSR will accrue

8   directly to this third party, the harm PSR has suffered will not be redressed by a favorable

9   outcome.  Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 39 ("The necessity that the

10  plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an

11  Art. III requirement.") PSR does not satisfy the third element of the constitutional standing test,

12  and therefore cannot maintain this action.[3]

13      PSR raises two arguments against this result that require treatment in this order.  First,

14  PSR argues that a narrow interpretation of the private right of action statute in the MTCA would

15  frustrate the intent of the statute.  This argument might be expanded here to suggest that the

16  Court's approach nullifies CERCLA's contribution statute.  See 42 U.S.C. § 9613(f)(3)(B) ("A

17  person who has resolved its liability to the United States . . . in an administrative or judicially

18  approved settlement may seek contribution from any person who is not party to a settlement . . .

19  .").  The simple answer to this argument is that entities that have "resolved [their] liability"

20  rarely do so in a manner similar to that of PSR; that is, in a manner that effects the total

21  dismantling of the operations of the pre-existing entity.  Thus, in most cases, a post-hoc

22  contribution action will directly benefit the company that was found liable—that company

23  would receive a direct fiduciary benefit for each dollar recovered in contribution actions.  If, for

24  _____

25      [3] PSR's analogy to bankruptcy actions is unavailing.  The duties and standing of a
    bankruptcy trustee are determined by statute pursuant to a constitutional mandate.  See 11
26  U.S.C. § 704; U.S. CONST. art. I, § 8, cl. 4.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  example, the consent decree in this case contemplated an amount that would "complete"

2  recovery of the West Seattle site, then PSR could argue that it would be able to retain any

3  recovery it was awarded in excess of that amount.  Because the PSR consent decree requires the

4  disbursements of all PSR interests to the trust, it cannot benefit in any way from the instant

5  action.

6       Second, PSR argues persuasively that this finding on redressability frustrates the purpose

7  of Judge Rothstein's consent decree, which seems to have contemplated the possibility of PSR's

8  pursuit of contribution actions.  Consent Decree at 29 ("Settling Defendant agree that, with

9  respect to any suit or claim for contribution brought by them for matters related to this Consent

10 Decree, they will notify Plaintiffs in writing no later than sixty (60) days prior to the initiation of

11 such suit or claim.").  From a policy perspective, this argument makes sense.  Nonetheless, the

12 Court is not in a position to confer standing where there is none.  PSR's injury under the terms

13 of the consent decree simply cannot be redressed by the present action.  With a proposed remedy

14 from which it will not benefit, PSR lacks a necessary element of Article III standing.

15 **C.    Tort Claims**

16      PSR's state law tort claims fail for similar reasons.  Notwithstanding the language that

17 PSR drew upon, in every pollution-related nuisance case cited by PSR, the plaintiff asserted

18 some substantial interest in the property that was polluted.  See Kitsap County v. Allstate Ins.

19 Co., 136 Wn.2d 567 (1998) (homeowners in trailer park where waste was disposed); Tiegs v.

20 Watts, 135 Wn.2d 1 (1998) (commercial farmer irrigating with polluted water); Miotke v.

21 Spokane, 101 Wn.2d 307 (1984) (waterfront property owners); Bales v. Tacoma, 172 Wash. 494

22 (1933) (fish hatchery owner).  PSR has offered no similar argument as to why it had any interest

23 in the use or enjoyment of the area polluted by the marine sediments unit.  The Court need not

24 reach the issue as to whether BNSF's alleged pollution constitutes a discrete or continuous tort.

25                          **III.  CONCLUSION**

26      For the foregoing reasons, IT IS HEREBY ORDERED that BNSF's motion for summary

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  judgment (Dkt. # 41) is GRANTED.  The Clerk of the Court is instructed to enter judgment for

2  Burlington Northern and Santa Fe Railway Company and against Pacific Sound Resources.

3

4          DATED this 6th day of February, 2006.

5

6

7

8                                          Robert S. Lasnik
                                           United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT