The Honorable Robert S. Lasnik

1

2

3

4

5

6

7                UNITED STATES DISTRICT COURT
              WESTERN DISTRICT OF WASHINGTON
8                       AT SEATTLE

9  PACIFIC SOUND RESOURCES, a            )
   Washington non-profit corporation; and THE )
10 PORT OF SEATTLE, a Washington         )   No. C04-1654L
   municipal corporation,                )
11                                       )
                              Plaintiffs, )  SECOND AMENDED NOTICE OF
12                                       )   APPEAL
        v.                               )
13                                       )
   THE BURLINGTON NORTHERN AND           )
14 SANTA FE RAILWAY COMPANY, a           )
   Delaware corporation; J.H. BAXTER & CO., )
15 a California limited partnership; J.H. )
   BAXTER & CO., a California corporation; )
16 and J.H. BAXTER & CO., INC., a California )
   corporation,                          )
17                                       )
                             Defendants. )
18 _____ )

19      On March 8, 2006 plaintiffs The Port of Seattle and Pacific Sound Resources filed a

20 Notice of Appeal to the United States Court of Appeals for the Ninth Circuit from the following

21 three orders of the District Court: (1) the Court's order dated August 17, 2005 (District Court

22 Docket Number 38) dismissing the Port of Seattle's claims; (2) the Court's order dated

23 February 6, 2006 (Docket Number 59) dismissing Pacific Sound Resources' claims; and (3) the

24 Court's Judgment dated February 15, 2006 (Docket Number 61).

25      On June 1, 2006 plaintiffs The Port of Seattle and Pacific Sound Resources filed an

26 Amended Notice of Appeal to the United States Court of Appeals for the Ninth Circuit to appeal

SECOND AMENDED NOTICE OF APPEAL - 1
Case No. C04-1654L

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

50699505 1

1  the Court's order dated May 23, 2006 denying plaintiffs' Motion for Reconsideration (Docket

2  Number 74).  The Amended Notice of Appeal was filed before the district court had ruled on

3  Defendant Burlington Northern Santa Fe's Motion for Attorney's Fees (Docket Number 64).

4      On July 17, 2006, the district court entered an order granting Burlington Northern Santa

5  Fe's Motion for Attorney's Fees (Docket 79).  Pursuant to FRAP 4(a)(4), this amended notice

6  adds the Court's ruling on the Motion for Attorney's Fees to the four prior rulings described in

7  the Amended Notice of Appeal.

8      DATED this 1st day of August, 2006.

9                                    FOSTER PEPPER PLLC

10                                   /s/Gillis E. Reavis
                                     Gillis E. Reavis, WSBA #21451
11                                   Attorneys for Plaintiffs
                                     1111 Third Avenue, Suite 3400
12                                   Seattle, WA 98101-3299
                                     Telephone:  (206) 447-7295
13                                   Fax:  (206) 749-2160
                                     Email:  reavg@foster.com

14

15

16

17

18

19

20

21

22

23

24

25

26

SECOND AMENDED NOTICE OF APPEAL - 2
Case No. C04-1654L

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

50699505.1

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2006, I electronically filed the foregoing Second Amended Notice of Appeal with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

| | |
|---|---|
| Thomas D. Adams<br>Bullivant Houser Bailey PC<br>1601 Fifth Avenue, Suite 2400<br>Seattle, WA 98101-1618<br>E-mail: tom.adams@bullivant.com<br>**Attorneys for Defendant The Burlington Northern and Santa Fe Railway Company** | John F. Barg<br>Marc A. Zeppetello<br>Barg Coffin Lewis & Trapp, LLP<br>One Market Steuart Tower, Suite 2700<br>San Francisco, CA 94105-1475<br>E-mail: jfb@bcltlaw.com<br>      maz@bcltlaw.com<br>**Attorneys for Defendant The Burlington Northern and Santa Fe Railway Company** |
| James C. Hanken<br>Law Offices of James C. Hanken<br>999 Third Avenue, Suite 3210<br>Seattle, WA 98104<br>E-mail: jhanken@hankenlaw.biz<br>**Attorneys for Defendants Baxter Entities** | Stephen J. Tan<br>Rodney L. Brown Jr.<br>David D. Dicks<br>Cascadia Law Group PLLC<br>1201 Third Ave., Suite 320<br>Seattle, WA 98101<br>E-mail: stan@cascadialaw.com<br>      rbrown@cascadialaw.com<br>      ddicks@cascadialaw.com<br>**Attorneys for Plaintiffs** |

s/ Gillis E. Reavis
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101
Telephone:   (206) 447-7295
Fax:             (206) 749-2160
E-mail: reavg@foster.com

SECOND AMENDED NOTICE OF APPEAL - 3
Case No. C04-1654L

50699505.1

# EXHIBIT 1

> USCA DOCKET # (IF KNOWN)
>
> 06-35455

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
## AMENDED CIVIL APPEALS DOCKETING STATEMENT

PLEASE ATTACH ADDITIONAL PAGES IF NECESSARY.

| | | |
|---|---|---|
| **TITLE IN FULL:**<br>PACIFIC SOUND RESOURCES, a Washington non-profit corp.; and THE PORT OF SEATTLE, a Washington municipal corp.,       Appellants,<br>v.<br>THE BURLINGTON NORTHERN AND SANTA FE RAILWAY COMPANY, a Delaware corp.; J.H. BAXTER & CO., a California limited partnership; J.H. BAXTER & CO., a California corp.; and J.H. BAXTER & CO., INC., a California corp.,       Respondents. | **DISTRICT:** W.D. Washington | **JUDGE:** Lasnik |
| | **DISTRICT COURT NUMBER: C04-1654L** | |
| | **DATE NOTICE OF APPEAL FILED:** 3/8/06 and first amended on 6/1/06 second amended on 8/1/06 | **IS THIS A CROSS-APPEAL?** ☐ YES |
| | **IF THIS MATTER HAS BEEN BEFORE THIS COURT PREVIOUSLY, PLEASE PROVIDE THE DOCKET NUMBER AND CITATION (IF ANY):** | |

**BRIEF DESCRIPTION OF NATURE OF ACTION AND RESULT BELOW:** This is a suit for recovery of environmental cleanup costs. On August 17, 2005, the court granted summary judgment on claims asserted by plaintiff Port of Seattle. On February 6, 2006, the court granted summary judgment dismissing plaintiff Pacific Sound Resources' claims. The court entered judgment on February 15, 2005. On May 23, 2006, the court denied plaintiffs' motion for reconsideration. On July 17, 2006, the court granted defendant BNSF' motion for attorneys' fees.

**PRINCIPAL ISSUES PROPOSED TO BE RAISED ON APPEAL:** Whether the trial court erred in granting both summary judgment motions, in awarding attorneys' fees to Defendant BNSF, or in dismissing the case rather than remanding it to state court as requested in plaintiffs' motion for reconsideration.

**PLEASE IDENTIFY ANY OTHER LEGAL PROCEEDING THAT MAY HAVE A BEARING ON THIS CASE (INCLUDE PENDING DISTRICT COURT POST JUDGMENT MOTIONS):** Now that the court has decided BNSF's motion for attorneys' fees, all proceedings in the district court are complete.

**DOES THIS APPEAL INVOLVE ANY OF THE FOLLOWING:**

☐ Possibility of settlement

☐ Likelihood that intervening precedent will control outcome of appeal

☐ Likelihood of a motion to expedite or to stay the appeal, or other procedural matters (Specify)

☒ Any other information relevant to the inclusion of this case in the **Mediation Program** The parties have already discussed settlement with the Ninth Circuit mediator and settlement did not appear likely.

☐ Possibility parties would stipulate to binding award by Appellate Commissioner in lieu of submission to judges

| JURISDICTION | | DISTRICT COURT DISPOSITION | |
|---|---|---|---|
| FEDERAL | APPELLATE | TYPE OF JUDGMENT/ORDER APPEALED | RELIEF |
| ☐ FEDERAL QUESTION | ☒ FINAL DECISION OF DISTRICT COURT | ☐ DEFAULT JUDGMENT | ☐ DAMAGES: SOUGHT $ ____ AWARDED $ ____ |
| ☒ DIVERSITY | ☐ INTERLOCUTORY DECISION APPEALABLE AS OF RIGHT | ☒ DISMISSAL/JURISDICTION | ☐ INJUNCTIONS: |
| ☐ OTHER (SPECIFY): | ☐ INTERLOCUTORY ORDER CERTIFIED BY DISTRICT JUDGE (SPECIFY): | ☒ DISMISSAL/MERITS | ☐ PRELIMINARY |
| | | ☒ SUMMARY JUDGMENT | ☐ PERMANENT |
| | ☐ OTHER (SPECIFY): | ☒ JUDGMENT/COURT DECISION | ☐ GRANTED |
| | | ☐ JUDGMENT/JURY VERDICT | ☐ DENIED |
| | | ☐ DECLARATORY JUDGMENT | ☒ ATTORNEY FEES: SOUGHT $ ____ AWARDED $1,061,115.42 |
| | | ☐ JUDGMENT AS A MATTER OF LAW | ☐ PENDING |
| | | ☐ OTHER (SPECIFY): | ☐ COSTS: $ ☐ |

## CERTIFICATION OF COUNSEL

**I CERTIFY THAT:**

1. COPIES OF ORDER/JUDGMENT APPEALED FROM ARE ATTACHED.

2. A CURRENT SERVICE LIST REPRESENTATION STATEMENT WITH TELEPHONE AND FAX NUMBERS IS ATTACHED (SEE 9TH CIR. RULE 3-2).

3. A COPY OF THIS AMENDED CIVIL APPEALS DOCKETING STATEMENT WAS SERVED IN COMPLIANCE WITH FRAP 25.

4. I UNDERSTAND THAT FAILURE TO COMPLY WITH THESE FILING REQUIREMENTS MAY RESULT IN SANCTIONS, INCLUDING DISMISSAL OF THIS APPEAL.

Signature                                                     Date 7/31/06

## COUNSEL WHO COMPLETED THIS FORM

| | |
|---|---|
| **NAME:** | Gillis E. Reavis, WSBA #21451 |
| **FIRM:** | Foster Pepper PLLC |
| **ADDRESS:** | 1111 Third Avenue, Suite 3400, Seattle, WA 98101-3299 |
| **E-MAIL:** | reavg@foster.com |
| **TELEPHONE:** | (206) 447-7295 |
| **FAX:** | (206) 2160 |

**\*THIS DOCUMENT SHOULD BE FILED IN THE DISTRICT COURT WITH THE NOTICE OF APPEAL \***
**\*IF FILED LATE, IT SHOULD BE FILED DIRECTLY WITH THE U.S. COURT OF APPEALS \***

50698649 1

# EXHIBIT 2

# United States District Court

### WESTERN DISTRICT OF WASHINGTON

PACIFIC SOUND RESOURCES, *et al.,*

      v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.*

**JUDGMENT IN A CIVIL CASE**

CASE NUMBER: C04-1654L

___  **Jury Verdict**. This action came before the Court for a trial by jury.  The issues have been tried and the jury has rendered its verdict.

_X_  **Decision by Court**. This action came to trial or hearing before the Court.  The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

    Defendant Burlington Northern and Santa Fe Railway Company's Motion for Summary Judgment is granted.

| | |
|---|---|
| February 15, 2006 | BRUCE RIFKIN |
| | Clerk |
| | |
| | s/Rhonda Stiles |
| | By, Deputy Clerk |

# EXHIBIT 3

1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

PACIFIC SOUND RESOURCES, *et al.*,

10

Plaintiffs,                          Case No.  C04-1654L

11

v.                          ORDER GRANTING MOTION FOR
                                      SUMMARY JUDGMENT
12

THE BURLINGTON NORTHERN AND
13   SANTA FE RAILWAY COMPANY, *et al.*,

14              Defendants.

15

16        This matter comes before the Court on the "Motion for Summary Judgment that Plaintiff

17   the Port of Seattle Has Incurred No Compensable Damages" (Dkt. # 25, the "Motion") filed by

18   defendant, The Burlington Northern and Santa Fe Railway Co. ("BNSF").  For the reasons set

19   forth below, BNSF's motion is granted.

20                          **I. BACKGROUND**

21        This dispute centers around the purchase and environmental cleanup of a wood treating

22   plant (the "Plant") located in West Seattle, Washington.  The Plant consists of approximately 22

23   acres of property on the shore of Elliott Bay near the Duwamish River.  The Plant became

24   contaminated with hazardous substances after nearly a century of wood-treating operations.  The

25   hazardous substances migrated from the Plant into adjacent properties and into state owned

26   aquatic lands and sediments in Elliott Bay.

1    Plaintiffs Pacific Sound Resources ("PSR") and the Port of Seattle (the "Port") seek
2  contribution under Washington's Model Toxics Control Act ("MTCA"), RCW 70.105D.80,
3  from defendants for expenses incurred in the cleanup of marine areas adjacent to the Plant.
4  Plaintiffs also seek a declaratory judgment asserting that defendants are jointly and severally
5  liable for cleanup costs of the marine areas as well as damages based on common-law theories of
6  negligence, nuisance, and trespass.

7    In its Motion, BNSF argues that the claim for contribution under the MTCA asserted by
8  the Port should be dismissed.  BNSF argues that the Port has incurred no compensable damages
9  because it has been reimbursed for all of the remedial cleanup costs at issue in this action.  The
10 Port argues that summary judgment is not appropriate because material issues of fact exist
11 regarding whether it has already obtained contribution and because the equitable distribution of
12 environmental cleanup costs required under the MTCA cannot be determined on summary
13 judgment.  Resolution of this dispute requires a discussion of the circumstances surrounding the
14 transfer of the Plant from PSR to the Port.

15    The following facts are not in dispute.  From December 1965 to August 1994, PSR and
16 its corporate predecessors owned and conducted wood-treating operations at the Plant.  The
17 Environmental Protection Agency ("EPA") began investigating the Plant in the 1980s.  After
18 nearly a decade of working with PSR to clean up the Plant, EPA took over the cleanup of the
19 contaminated properties in May, 1994, and placed the Plant and adjacent properties on the
20 National Priorities List of Superfund sites (the "West Seattle Site").  The West Seattle Site
21 included the Plant and the surrounding areal extent of contamination.  The EPA separated the
22 West Seattle Site into two "operable units."  The "Uplands Unit" included the Plant.  The
23 "Marine Sediments Unit" included the submerged properties in and adjacent to Elliott Bay.

24    In early 1990, the Port became interested in acquiring the Plant in connection with its
25 Southwest Harbor Cleanup and Redevelopment Project ("the SW Harbor Project").  Under the
26 SW Harbor Project, the Port intended to enlarge and modernize the container shipping facility

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1    referred to as Terminal Five.  The Port had negotiated a cargo shipping lease with American

2    President Lines ("APL"), a major shipping company.  The Port considered redevelopment and

3    use of the Plant for container storage, other vessel cargo activities, and public access as a critical

4    part of the SW Harbor Project, and extremely important to the economy of the region.

5            The Port, however, was reluctant to purchase the Plant because of the environmental

6    liability associated with it.  As a result, the Port began negotiating both with PSR regarding the

7    purchase of the Plant  and with the EPA to determine the specific remedial actions the Port

8    could implement in return for a release of all further environmental liability.  These protracted

9    negotiations occurred as PSR faced environmental cleanup liability for both the West Seattle

10   Site and a second facility located on Bainbridge Island that had also been registered as a

11   superfund site (the "Eagle Harbor Site").  The EPA, the Suquamish Tribe, and the Muckleshoot

12   Indian Tribe (together, the "CERCLA Plaintiffs") filed a complaint against PSR and individual

13   defendants seeking damages under CERCLA[1] relating to environmental contamination at both

14   the West Seattle and Eagle Harbor Sites.  Consequently, PSR entered into settlement

15   negotiations with the CERCLA Plaintiffs.

16           These multi-party negotiations resulted in the execution of four different agreements.

17   The first of these agreements is the Agreement for Option to Purchase and for Purchase and Sale

18   of Real Estate (the "Purchase Agreement") entered into by the Port and PSR on November 24,

19   1993.  Under the terms of the Purchase Agreement, the Port payed $1.4 million for the option to

20   purchase the Plant.  The parties agreed that the purchase price for the Plant would be $9 million

21   and stated that the $1.4 million option would be credited against the purchase price if the Port

22   exercised its option to buy the Plant.  The Purchase Agreement recognized PSR's ongoing

23   negotiations of a consent decree with the EPA as well as the Port's negotiations with the EPA

24

25   _____

26           [1]The Comprehensive Environmental Response, Compensation, and Liability Act of 1980,
     as amended, ("CERCLA"), 42 U.S.C. §§ 9606 & 9607.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1 regarding the acquisition of the Plant subject to a plan to remediate environmental damage.  The

2 Port conditioned its purchase on the entry of the consent decree and upon the execution of an

3 agreement between the Port and the EPA that would resolve the Port's liability for any

4 environmental cleanup.  The Purchase Agreement was binding on the Port and PSR, as well as

5 their successors.  The Port exercised its option and paid PSR $1.4 million which, in keeping

6 with the terms of the Purchase Agreement, was immediately dispersed to PSR's creditors.

7 　　　In August 1994, this Court entered a Consent Decree negotiated among the CERCLA

8 Plaintiffs, PSR and the individual defendants.  Under the terms of the Consent Decree, the

9 shareholders of PSR agreed to transfer all of their shares to the Pacific Sound Resources

10 Environmental Trust (the "PSR Trust").  PSR would, accordingly, dissolve into the PSR Trust,

11 and all of its assets were to be liquidated according to an agreed upon liquidation plan.  The

12 beneficiaries of the PSR Trust were the United States, the Suquamish Tribe, and the

13 Muckleshoot Indian Tribe.  The accompanying liquidation plan required the PSR Trust to use

14 the proceeds first to pay necessary expenses, then to pay PSR's creditors.  The remaining

15 proceeds were to be split evenly between the United States Hazardous Substance Superfund

16 Trust and an account established by the Consent Decree.

17 　　　In September 1994 the EPA and the Port entered into an Agreement and Covenant Not to

18 Sue Re PSR Superfund Site (the "EPA Covenant").  Under the EPA Covenant, the EPA

19 acknowledged that the Plant would not be transferred to the PSR Trust, but would be sold

20 directly to the Port by PSR.  In consideration for the acquisition of the Plant, the Port agreed to

21 pay $9 million directly to the PSR Trust. Dkt. # 34, Decl. of Gillis R. Reavis ("Reavis Decl.") at

22 p. 70, ¶ 5.3.  In addition, the Port agreed to provide "in-kind consideration" of $7.2 million.

23 This in-kind consideration would be paid by the Port through its environmental cleanup efforts

24 at the Plant.  Since the Port intended to prepare the site for use as a cargo loading facility for

25 vessels, the parties recognized that some of the activities at the site would be for environmental

26 cleanup and some for property improvement.  The Port and the EPA agreed that for every dollar

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

-4-

1   the Port spent, it would receive 75 cents credit to its in-kind contribution requirement.

2          Once the Port had paid its in-kind contribution, the EPA Covenant anticipated that the

3   Port would be reimbursed from the PSR Environmental Trust for its additional cleanup costs.

4   The parties agreed that the Port could obtain up to the $9 million it had paid to the PSR Trust as

5   reimbursement for its cleanup costs, upon the submission of invoices describing the activities

6   performed and the costs incurred.  The Port agreed that it would not look to the PSR Trust for

7   reimbursement in excess of $9 million, but the Port reserved the right to present its claims to the

8   Hazardous Substance Superfund for reimbursement of environmental response costs expended to

9   implement the EPA Covenant over and above the $9 million purchase price and $7.2 million in-

10  kind contribution.  The Port also reserved the right to seek contribution for all environmental

11  response costs from any responsible third parties.

12         Under CERCLA, the Port could have become liable as a potentially responsible party for

13  contamination at the Plant.  The EPA Covenant freed it from liability for response costs for

14  cleaning up the Plant.  Under the terms of the EPA Covenant, the Port also assumed no liability

15  for the Marine Sediments Unit, which was not part of the Plant but is part of the West Seattle

16  Site.  The Marine Sediments Unit consists of properties owned by Washington's Department of

17  Natural Resources ("DNR") and it was recognized that contamination from PSR's wood-

18  treatment facilities had come to rest on these properties, as well.

19         In September, 1994 the EPA and the Port entered into a second agreement entitled

20  "Administrative Order on Consent Re Pacific Sound Resources Superfund Sites" (the "AOC").

21  The AOC governed the performance of environmental response activities entered into by the

22  Port at the West Seattle Site.  The AOC recognized that the Port was not a responsible party

23  under CERCLA, but had agreed to undertake all actions required under the AOC.  The AOC

24  recognized that under the EPA Covenant the Port would perform up to $16.2 worth of

25  environmental response activities.  The AOC identified a number of tasks that the Port was

26  required to complete and, together with an attached Statement of Work, listed six additional

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1    tasks to be performed by the Port.

2           By June, 1998, the Port had completed the remedial tasks set forth in the AOC.  It had

3    satisfied its $7.2 million in-kind contribution requirement under the EPA Covenant, but had not

4    exhausted the $9 million of PSR Trust funds from which it could seek reimbursement.

5           In September 1999, the EPA issued a Record of Decision ("ROD") in which it reported

6    on its proposed remedies for the Upland Unit and Marine Sediments Unit of the Superfund Site.

7    With regard to the Upland Unit, which mainly consisted of the Plant, the EPA determined that

8    the remedial actions taken according to the agreements between the Port and the EPA had

9    eliminated the risks posed by exposure to contaminated soil and groundwater.  The ROD

10   determined that no additional remedial measures were necessary.  With regard to the Marine

11   Sediments Unit, the EPA proposed that (1) a cap of clean material be placed over a portion of

12   the contaminated sediments; (2) approximately 3,500 cubic yards of sediments be dredged for

13   navigational purposes; and (3) unused pilings be removed.

14          In December 2002, the Port and EPA entered into a Supplemental Administrative Order

15   on Consent Re PSR Superfund Site ("Supplemental AOC").  According to the terms of the AOC,

16   the Port assumed no liability for the DNR properties that constituted the Marine Sediments Unit

17   of the Superfund Site.  Nevertheless, in the Supplemental AOC the Port agreed to perform

18   additional environmental response actions in keeping with the ROD's determinations.  The

19   additional response actions were to be covered by the same terms and conditions as the AOC,

20   that is, the Port was to seek reimbursement for its costs from the remaining money in the PSR

21   Trust.  For the work done under the Supplemental AOC, the Port was to receive 100 percent

22   reimbursement, rather than the previous 75 cents on the dollar, for the costs incurred.  The Port

23   incurred reimbursement for its cleanup efforts of at least $499,985.  Those reimbursements were

24   authorized by the EPA and paid by the PSR Trust.  The Port now seeks contribution from BNSF

25   for the cleanup costs associated with the work performed under the Supplemental AOC.

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1

## II. DISCUSSION

2 **A.     Summary Judgment Standard of Review.**

3      Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

4 and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

5 to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

6 R. Civ. P. 56(c).  A court must construe all facts in favor of the party opposing summary

7 judgment.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Once the moving

8 party has demonstrated the absence of a genuine issue of fact as to one or more of the essential

9 elements of a claim or defense, the opposing party must make an affirmative showing on all

10 matters placed at issue by the motion as to which the opposing party has the burden of proof at

11 trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  In such a situation Fed. R. Civ. P.

12 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by

13 the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts

14 showing that there is a genuine issue for trial.'"  Id. at 324 (quoting Fed. R. Civ. P. 56(e)); see

15 also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)

16 ("When the moving party has carried its burden under Rule 56(c), its opponent must do more

17 than simply show that there is some metaphysical doubt as to the material facts").

18 **B.     Has the Port Already Been Compensated for Cleanup of the Marine Sediments Unit?**

19      The parties agree that under the Supplemental AOC, the Port was reimbursed from the

20 PSR Trust for all costs incurred for its cleanup of the Marine Sediments Unit.  BNSF argues that

21 because of this reimbursement any amounts awarded through this lawsuit would constitute an

22 impermissible double recovery.  The Port, for its part, argues that it was not compensated

23 through the PSR Trust reimbursement because, in essence, the reimbursement merely returned to

24 the Port the money that the Port had placed into the PSR Trust for the purpose of conducting

25 environmental cleanup.  Since, the Port contends, the money was the Port's to begin with, it

26 argues that no double recovery has occurred here.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1    To resolve this dispute, the Court must turn to the terms of the agreements among the
2    Port, PSR, and the EPA. The parties agree that the terms of the agreements, including the Court-
3    imposed Consent Decree, must be construed according to Washington law. See e.g. Thompson
4    v. Enomoto, 915 F.2d 1383, 1388 (9th Cir. 1990) (in interpreting a consent decree, the Court
5    must apply general contract principles using the law of the state where the agreements were
6    made); Collins v. Thompson, 8 F.3d 657, 659 (9th Cir. 1993) (holding that consent decrees are
7    interpreted using contract principles), cert denied, 511 U.S. 1127 (1994).
8        Washington courts have adopted the "context rule" of contract interpretation, which
9    allows "a court to look to extrinsic evidence to discern the meaning or intent of words or terms
10   used by contracting parties, even when the parties' words appear to the court to be clear and
11   unambiguous." Hollis v. Garwall, Inc., 137 Wn.2d 683, 693 (1999) (citing Berg v. Hudesman,
12   115 Wn.2d 657, 668-69 (1990)). The use of extrinsic evidence is not wholly unrestricted,
13   however. The Washington Supreme Court recently reaffirmed that even under the context rule
14   the parties' intent is determined "by focusing on the objective manifestation of the agreement,
15   rather than on the unexpressed subjective intent of the parties. . . . Thus, when interpreting
16   contracts, the subjective intent of the parties is generally irrelevant if the intent can be
17   determined from the actual words used." Hearst Communications, Inc. v. Seattle Times Co.,
18   154 Wn.2d 493, 503-504 (2005). The circumstances surrounding the formation of a contract
19   and other extrinsic evidence may be used "'to determine the meaning of *specific words and*
20   *terms used*'" but not to "'show an intention independent of the instrument' or to 'vary,
21   contradict or modify the written word.'" Id. at 17 (emphasis in original) (quoting Hollis v.
22   Garwall, Inc., 137 Wn.2d at 695-96).
23       Applying these principles to the agreements executed among the Port, PSR, and the EPA,
24   makes it clear that the $9 million transferred from the Port to the PSR Trust was a payment in
25   exchange for the purchase of the Plant. Although the $9 million may have been earmarked to
26   reimburse the Port for its cleanup activities, that does not alter the undisputed fact that the Port

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   agreed to pay $9 million for the Plant and, with the transfer of the money to the PSR Trust,

2   satisfied its agreement.

3       The parties do not dispute that, according to the terms of the Purchase Agreement, "[t]he

4   purchase price of the [Plant] shall be $9,000,000." Reavis Decl. at p. 148, ¶ 2. There is no

5   dispute that the Port exercised its option under the Purchase Agreement and that the Port

6   purchased the Plant from PSR. The Port, however, attempts to sidestep the plain meaning of the

7   Purchase Agreement by pointing to the context in which the document was executed. The

8   context of these agreements, the Port contends, creates a legitimate question of fact regarding

9   whether the $9 million was transferred to the PSR Trust as payment for the Plant.

10      Viewing the Purchase Agreement in context with the other agreements, however, does not

11  create a legitimate question of fact. To the contrary, the context makes it clear that the Purchase

12  Agreement meant what it said:  the Port paid $9 million to purchase the Plant. The Consent

13  Decree, for instance, anticipates that the purchase of the Plant will be governed by the terms of

14  the Purchase Agreement. In discussing the sale of PSR's real property, the Consent Decree

15  defers to the attached and incorporated Liquidation Plan. Reavis Decl. at p. 27, ¶ 29. The

16  Liquidation Plan states that "[t]he parties to the Consent Decree of which this Liquidation Plan

17  is a part contemplate that the real estate upon which PSR operates a woodtreating plant at West

18  Seattle will be acquired by the Port of Seattle pursuant to the terms of [the Purchase Agreement]

19  to be negotiated between PSR and the Port." Id. at p. 56, ¶ 7(a). The terms of the Consent

20  Decree provide no occasion to doubt or re-interpret the language of the Purchase Agreement.

21      Similarly, the EPA Covenant affirms the conclusion that the $9 million paid into the PSR

22  Trust by the Port was for the purchase of the Plant. The EPA Covenant indicates that the parties

23  intend the Plant to be sold by PSR to the Port "in accordance with the terms of the consent

24  decree." Id. at 69-70, ¶ 5.3. The AOC, executed on the same day as the EPA Covenant,

25  contains nearly identical language. See id. at 93, ¶ 16. As noted above, the Consent Decree

26  asserts that the Plant will be purchased by the Port according to the terms of the Purchase

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   Agreement.

2          The Port makes two arguments to support its claim that a legitimate question of fact exists

3   regarding whether the $9 million transferred to the PSR Trust was a payment for property, or a

4   deposit of its own money for future withdrawals.  First, the Port notes that the Plant was

5   appraised as worth $8 million without considering the costs of environmental cleanup.  The

6   environmental clean up, in turn, was estimated as costing between $40 and $50 million.  Based

7   on these numbers, the Port argues that to find that it paid $9 million for the Plant "depends on

8   the illogical analysis that the Port paid $9 million for a worthless piece of property."  Dkt. # 32,

9   Opp. at p. 11.  Washington courts, however, are generally unwilling to inquire into the adequacy

10  of consideration.  See Labriola v. Pollard Group, Inc., 152 Wn.2d 828, 834 (2004) (citing

11  Browning v. Johnson, 70 Wn.2d 145, 147 (1967)).  Instead of looking at "the comparative value

12  of the promises and acts exchanged," Washington courts ask whether the consideration is legally

13  "sufficient."  Browning, 70 Wn.2d at 147.

14          The context of these agreements makes it clear that the exchange of the Plant for the $9

15  million payment was legally sufficient.  The Port intended to use the Plant to expand the

16  shipping cargo and container storage capacity as part of its SW Harbor Project.  The Port

17  acknowledged that "[r]edevelopment and use of the [Plant] by the Port and its tenants for

18  container storage, other vessel cargo activities, and public access . . . is extremely important to

19  the Port and the economy of the region."  Reavis Decl. at pp. 73-74, ¶ 8.2.  As the Port

20  concedes, it "would not have acquired the highly contaminated [Plant] had it not been

21  absolutely necessary for the completion of the [Southwest Harbor Project]."  Dkt. # 35, Decl. of

22  Thomas A. Newlon at p. 2, ¶ 8.  Under the circumstances, there is no question that the Plant was

23  sufficient consideration for the $9 million payment.[2]

24  _____

25          [2]Not only was the location of the Plant significant, the timing of the acquisition mattered

26  as well.  The Port does not dispute that the leasing contract with APL required the Port to

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1      Second, the Port argues that the $9 million was paid to the PSR Trust in consideration for
2 the EPA Covenant, not for the purchase of the Plant.  Although the Port is correct that the $9
3 million placed into the PSR Trust comprised a portion of the consideration for the EPA
4 Covenant, that does not mean that the $9 million was not also the consideration for the purchase
5 of the Plant.  The Port's characterization ignores the plain meaning of the Purchase Agreement
6 and, what is more, ignores the statements in the EPA Covenant recognizing that the $9 million to
7 be paid to the PSR Trust was for the purchase of the Plant.  For instance, the EPA Covenant
8 states that $9 million to be paid by the Port includes "payments made into options and escrow by
9 the Port prior to the closing of the purchase and sale agreement for the PSR property."  EPA
10 Covenant at ¶ 11.1.  This is entirely consistent with the terms of the Purchase Agreement, which
11 asserted that the option price and other expenses would be deducted from the $9 million
12 purchase price.  It is also consistent with what actually occurred.  The Port only placed $7.3
13 million into the PSR Trust.  See Dkt. # 27, Decl. of Marc A. Zeppetello at p. 10, 12-13.  This
14 amount satisfied the Port's obligations under the Purchase Agreement once the option fee and
15 other costs had been subtracted from the $9 million total.

16      The Port argues that it had always considered the $9 million as its own money deposited
17 with the PSR Trust, not as money that it paid for the Plant that was then part of the
18 reimbursement pool.  The plain language of the agreements, however, does not support this
19 contention, and the Port's subjective beliefs regarding the money are irrelevant to determining
20 the meaning of the agreements.  See Hearst, 154 Wn.2d at 503-504.  In any event, this belief is

21 _____

22 provide it with constructed shipping facilities by a specific date or face $17,000.00 per day in
23 penalties.  See Reavis Decl. at p. 164.  As the Port acknowledged, "the redevelopment efforts
designed to expand container shipping facilities . . . are extremely time sensitive.  The Port
24 cannot wait the many years that would normally be required for EPA to completely clean up the
site and make it available for productive economic use."  Dkt. # 26, Decl. of Thomas D. Adams
25 at p. 114.  Thus, it appears as if the Port also paid a premium to obtain the Plant in time to
26 satisfy its obligations under the APL lease.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  belied by documents and statements made at or near the time the agreements were executed.  For

2  instance, PSR's 1994 tax return indicates that it claimed the $9 million as the proceeds from the

3  sale of its property.  In addition, in a June 22, 1994 letter to the Department of Justice, the Port

4  indicated that it would "pay the [PSR] Trust for title to the property."  Adams Decl. at p. 114.

5  More recent statements from the Port echo this understanding.  In October 8, 2002, the Port

6  asserted that the EPA Covenant "required the Port to acquire the PSR property for a purchase

7  price of $9 million as delineated in the [Purchase Agreement]. . . ."  Adams Decl. at p. 122.

8      Because the $9 million paid to the PSR Trust constituted consideration for the acquisition

9  of the Plant, that money became the property of the PSR Trust upon the completion of the

10  transaction.  Although the Port may have been reimbursed for its cleanup activities from the

11  same pool of money, the money did not belong to the Port.  The payments from the PSR Trust to

12  the Port for its cleanup of the Marine Sediments Unit are properly construed as contributions

13  from the PSR Trust used to reimburse the Port for its environmental cleanup costs.  Both the

14  terms of the agreements and the context in which they were executed indicate that the Port has

15  been fully compensated by the PSR Trust for the costs incurred in cleaning up the Marine

16  Sediments Unit.

17  **C.      Contribution under MTCA.**

18      Under the MTCA, a party may file a claim "for the recovery of remedial action costs" it

19  has incurred.  RCW 70.105D.080.  Any recovery of costs incurred "shall be based on such

20  equitable factors as the court determines are appropriate."  Id.  The Port argues that, even

21  assuming that this Court finds that it has been fully reimbursed for its cleanup expenses,

22  summary judgment is not appropriate because the Court must consider equitable factors, which

23  are inherently fact-based, in allocating contribution claims.  The Port, however, ignores the fact

24  that a "party seeking contribution bears the burden of establishing its entitlement to

25  contribution."  City v. Washington State Dep't of Transp., 98 Wn. App. 165, 175 (1999).  Here,

26  the Port is not entitled to contribution because it has failed to show that there are any costs it has

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   incurred that have not already been recouped.  Indeed, the Port acknowledges that it has been

2   fully reimbursed for its expenses in cleaning up the Marine Sediments Unit.  Put simply, since

3   the Port cannot identify any costs to recoup, it is not entitled to contribution.

4          Furthermore, because the Port has already recouped its costs, any contribution by BNSF

5   would amount to a double recovery.  Although the MTCA does not contain an explicit ban on

6   double recovery, Washington courts prohibit such a windfall.  See Seafirst Ctr. Ltd. Partnership

7   v. Erickson, 127 Wn.2d 355, 365 (1995) (the law does not sanction double recovery);  Brink v.

8   Griffith, 65 Wn.2d 253, 259 (1964) (plaintiff not allowed to recover twice for same elements of

9   damages arising from the same occurrence); Eagle Point Condo. Owners Ass'n v. Coy, 102 Wn.

10  App. 697, 702 (2000) (basic principle of damages is that there shall be no double recovery for

11  the same injury); Barney v. Safeco Ins. Co. of Am., 73 Wn. App. 426, 428 (1994) (applicable

12  measure of damages is public policy with respect to recovery; double recovery violates public

13  policy), overruled on other grounds by Price v. Farmers Ins. Co. of Wash., 133 Wn.2d 490

14  (1997); Pannell v. Food Servs. of Am., 61 Wn. App. 418, 444-45 (1991) (plaintiffs' employment

15  discrimination action damages for front pay were duplicative as a matter of law to damages for

16  lost business opportunity); Wilson v. Brand S Corp., 27 Wn. App. 743, 747 (1980) (double

17  recovery is contrary to the principle of compensatory damages); Kammerer v. W. Gear Corp., 27

18  Wn. App. 512, 526-27 (1980) (award of damages for fraudulently inducing contract and breach

19  of same contract was improperly duplicative), aff'd, 96 Wn.2d 416 (1981).  There is no question

20  that Washington's limitation against double recovery of compensatory damages would apply to

21  contribution claims under the MTCA.

22

23

24

25

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1

**III. CONCLUSION**

2   Based on the foregoing, the Motion for Summary Judgment that Plaintiff the Port of

3   Seattle Has Incurred No Compensable Damages" (Dkt. # 25) filed by BNSF is GRANTED.

4

5   DATED this 17th day of August, 2005.

6

7

8                                    Robert S. Lasnik

9                                    United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

# EXHIBIT 4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC SOUND RESOURCES, *et al.*,

      Plaintiffs,

    v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.*,

      Defendants.

Case No.  C04-1654L

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

     This matter comes before the Court on "Defendant BNSF Railway Company's Motion for Summary Judgment that Plaintiff Pacific Sound Resources has Incurred No Remedial Action Costs Under MTCA and Lacks Standing to Seek Contribution or Damages and that PSR's Common Law Claims are Time Barred" (Dkt. # 41, "the motion") filed by defendant, The Burlington Northern and Santa Fe Railway Co. ("BNSF").  For the reasons set forth below, BNSF's motion is granted.[1]

## I. BACKGROUND

     Much of the factual background of this case has been set forth in the Court's previous order granting summary judgment to BNSF on the claims of the Port of Seattle (Dkt. # 38).

---

[1] Because the Court finds that this matter can be decided on the parties' memoranda, declarations, and exhibits, plaintiff's request for oral argument is denied.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   Only the key facts are recited here.  Pacific Sound Resources ("PSR") is the successor in every

2   respect of the Wyckoff Company ("Wyckoff"), which operated wood treating facilities on

3   Bainbridge Island and in West Seattle, both of which the Environmental Protection Agency

4   ("EPA") placed on the National Priorities List of Superfund sites (respectively, "the Eagle

5   Harbor site" and "the West Seattle site").

6         In 1985, the company, its president and several of its employees entered into plea

7   agreements with the government for criminal violations of the Clean Water Act ("the CWA"), 33

8   U.S.C. § 1319, and the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6928.

9   Adams Decl. at 69–74.  Wyckoff and EPA agreed to an administrative order in September, 1987,

10  pursuant to RCRA and the Comprehensive Response Compensation and Liability Act

11  ("CERCLA"), 42 U.S.C. § 9606, which required Wyckoff to perform certain investigative and

12  remedial actions at the West Seattle site.  Adams Decl. at 91–92.  After determining Wyckoff's

13  action to be insufficient, the EPA issued a unilateral administrative order with several additional

14  demands on January 9, 1990.  Id. at 75.

15        On March 29, 1990, Wyckoff replied to that order in a letter to EPA, arguing that strict

16  compliance would force the plant to close its doors, declare bankruptcy, and cease all of its

17  remedial environmental efforts.  Id. at 95–104.  Wyckoff's lawyers suggested that, instead, the

18  company be allowed to continue operations and dedicate all of its budget to clean up efforts as it

19  pursued a sale of the property to the Port of Seattle ("the Port").  For the remaining shareholders

20  to consent to this plan of action, however, the government would have to agree not to hold them

21  personally liable.

22        Although EPA did not agree to this exact approach, multi-party negotiations soon

23  commenced between EPA, the Suquamish and Muckleshoot Indian Tribes (together, the

24  "CERCLA plaintiffs"), PSR and the Port.  On November 24, 1993, the Port and PSR arrived at a

25  purchase agreement conditioned on the result of the ongoing negotiations with EPA to secure a

26  consent decree and to resolve the Port's liability for environmental remediation.  The consent

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   decree was lodged with this Court in May, 1994 and entered in August, 1994. See id. at 35–57

2   (hereinafter the consent decree will be referred to using its internal page numbers).

3       As a part of the consent decree, all of the assets and resources of PSR were liquidated and

4   the proceeds from the liquidation were to benefit a new entity - the Pacific Sound Resources

5   Environmental Trust ("the trust"), the beneficiaries of which were the CERCLA plaintiffs.

6   Consent Decree at 16. As part of this agreement, individual settling defendants Tom Wyckoff,

7   Margo Wyckoff and Susan Wyckoff Mullen transferred their shares, ownership rights and

8   interests in PSR to the trust. Id. Also, individual settling defendants Charles and Susan Mullen

9   resigned as directors of PSR and Charles Mullen also resigned as its secretary. Id. Individual

10  settling defendant Ted DePriest, PSR's president, agreed to become the sole employee of the

11  trust. Id. at 15.

12      The parties agreed that the "assets and resources of PSR shall be liquidated and the

13  proceeds therefrom shall be disbursed by the Environmental Trust pursuant to the Liquidation

14  Plan. Such proceeds from this liquidation which are exclusively for the benefit of Plaintiffs

15  shall be paid as follows: One half into the United States Substance Superfund Trust ("the fund")

16  in the manner set forth below, and the other one-half into the registry of this court, as set forth in

17  the Liquidation Plan, and in accordance with the Memorandum of Agreement [which] was

18  entered into by the Plaintiffs to ensure that settlement proceeds would be applied toward both

19  environmental response and natural resource restoration goals." Id. at 16–17.

20      In exchange for the defendants' cooperation in this regard, the CERCLA plaintiffs agreed

21  not to file any civil or administrative actions against the defendants.[2] Id. at 25–26. Further, the

22

23  _____

24      [2] Plaintiff correctly point out that the entity PSR is not listed in the paragraph indicating
    which of the defendants were not to be subject to civil or administrative actions. However, PSR

25  was also understood to be liquidated by the agreement, Consent Decree at 3, and also explicitly
    refused to admit liability in the agreement, id. at 2–3, so plaintiff's statement that PSR "is

26  therefore still liable," Response at 17, is dubious.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT
                                        -3-

1   CERCLA plaintiffs agreed to settle their litigation "without admission of liability by Settling

2   Defendants." Id. at 2–3.

## II. DISCUSSION

**A.   Standard of Review**

5   Summary judgment is proper if "the pleadings, depositions, answers to interrogatories,

6   and admissions on file, together with the affidavits, if any, show that there is no genuine issue as

7   to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.

8   R. Civ. P. 56(c). A court must construe all facts in favor of the party opposing summary

9   judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Once the moving

10  party has demonstrated the absence of a genuine issue of fact as to one or more of the essential

11  elements of a claim or defense, the opposing party must make an affirmative showing on all

12  matters placed at issue by the motion as to which the opposing party has the burden of proof at

13  trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In such a situation, Fed. R. Civ.

14  P. 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or

15  by the 'depositions, answers to interrogatories and admissions on file,' designate 'specific facts

16  showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)); see

17  also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)

18  ("When the moving party has carried its burden under Rule 56(c), its opponent must do more

19  than simply show that there is some metaphysical doubt as to the material facts.").

**B.   MTCA Claims**

21  PSR seeks contribution from BNSF under Washington's Model Toxics Control Act

22  ("MTCA"), which states:

23      Except as provided in RCW 70.105D.040(4)(d) and (f), a person may bring a
    private right of action, including a claim for contribution or for declaratory relief,
24      against any other person liable under RCW 70.105D.040 for the recovery of
    remedial action costs.

25
26  RCW 70.105D.080. PSR argues that the plain meaning of the statute authorizes anyone that has

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  paid funds to support remedial actions as defined by the MTCA to seek contribution, pursuant to

2  equitable considerations, from any party that is liable for the harm caused.

3        BNSF disputes that this provision was intended to be used in the manner proposed by

4  PSR.  Most importantly, BNSF argues, PSR itself did not actually incur any remedial action

5  costs to bring it within the purview of the statute.  Rather, it was liquidated to form the trust

6  which, for the most part, paid EPA to conduct remedial activities.  For similar reasons, PSR also

7  lacks standing under Article III of the Constitution.  First, it has not suffered an injury that is

8  traceable to any wrongdoing by BNSF.  Second, because the remedy it seeks in the instant suit

9  would, in accordance with the Consent Decree, be paid directly into the trust, no conceivable

10  injury would be redressed by BNSF's payment.

11  *1.*    *Remedial Action Costs Under RCW 70.105D.080*

12        The Court finds that the term "remedial action costs" for the purpose of this statute

13  encompasses contributions to an environmental trust if the sole purpose of that trust is to

14  distribute the funds to a specific environmental clean up effort.  The Washington Department of

15  Ecology ("Ecology" or "the department") has broadly construed the definition of "remedial

16  action costs" for the purpose of the private right of action statute.  See WAC 173-340-545.  That

17  regulation provides that remedial action costs include those costs that are expended on an action

18  that "has been or is being conducted under an order or decree and the remedial requirements of

19  the order or decree."  WAC 173-340-545(2)(b).  Moreover, the regulations generally evince an

20  intent to construe the statute broadly.

21        PSR's protestations that BNSF's interpretation of the private right of action statute limits

22  recovery to "only the costs of work performed personally by the plaintiff" are somewhat

23  exaggerated.  Response at 5.  BNSF is correct that in a typical contribution action, the

24  organization seeking recovery will have taken the lead in organizing, directing and funding the

25  contractors who perform the direct environmental clean up efforts.  See, e.g., Cooper Indus., Inc.

26  v. Aviall Servs., Inc., 543 U.S. 157 (2004).  In the instant case, PSR contributed to an

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  organization that then performed these functions independently.  However, the funds paid to the
2  environmental trust were intended for a specific environmental clean up effort.  The trust acts
3  merely as a bureaucratic "middle man" to manage the proceeds from the PSR liquidation and
4  coordinate the expenditure of those funds at the sites.

5       BNSF's approach would require elaborate inquiries into the path of remedial action funds
6  from a liable party.  This would interfere with the efficient coordination of environmental clean
7  up efforts, as courts and contributing parties might be concerned that the use of an entity to
8  manage funds and clean up efforts might create a roadblock to post-hoc private actions for
9  contributions.  For the Court to interpret the private cause of action statute as BNSF suggests
10 would therefore frustrate the intent of the drafters of the law.  PSR's payment of funds to the
11 trust for the purpose of environmental clean up at the West Seattle site constitute "remedial
12 actions costs" within the purview of RCW 70.105D.080.

13 2.    *Standing to Seek Contribution: Injury and Causation*

14      In order to pursue its private cause of action against BNSF, PSR must have standing
15 under Article III of the Constitution.  U.S. CONST. art. III, § 2.  The Supreme Court has provided
16 a three-part test to determine standing.  See, e.g., Lujan v. Defenders of Wildlife, 504 U.S. 555,
17 560–61 (1992).  The first two elements are that "the plaintiff must have suffered an 'injury in
18 fact'—an invasion of a legally protected interest which is (a) concrete and particularized, and (b)
19 actual or imminent, not 'conjectural' or 'hypothetical,'" and "there must be a causal connection
20 between the injury and the conduct complained of--the injury has to be 'fairly . . . trace[able] to
21 the challenged action of the defendant, and not . . . th[e] result [of] the independent action of
22 some third party not before the court.'" Id. (internal quotations and citations omitted).

23      The CERCLA action against PSR began in the early 1980s.  After some stalling, PSR
24 ultimately sought to wash its hands of all responsibility for the cleanup of the West Seattle site.
25 As is clear from the documentation presented by the parties, the individual shareholders and
26 directors of PSR perceived their potential corporate and personal liability for this environmental

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   crisis as so severe that they traded any and all value of the company in exchange for immunity

2   from suit. PSR's directors and shareholders assessed the cost of cleanup for their environmental

3   harms to be so far higher than the value of the company that they readily divested themselves of

4   their stake in the company in exchange for the guarantee that their personal fortunes would not

5   be pursued. The harm for which PSR now seeks contribution, then, is the decision to enter into

6   the consent decree and liquidate the company. PSR has incurred costs by contributing to a trust

7   that works to clean up the site, and these costs are mandated by the consent decree. This

8   constitutes a "concrete and particularized" injury.

9        This injury was caused by the directors' and company's assessment of their own potential

10   liability for the environmental harm. Nonetheless, BNSF's alleged pollution played a role in

11   causing this injury. Because PSR would be held jointly and severally liable for the entire

12   environmental injury to the West Seattle site, the pollution caused by BNSF would figure into its

13   assessment of its capacity to pay for the damages and continue its business operations. See 42

14   U.S.C. § 9607(a)(4) (describing joint and several liability under CERCLA). Because PSR faced

15   increased expense due to BNSF's alleged pollution, it can be concluded that BNSF may have

16   caused, at least in part, the injury to PSR.

17   3.    *Standing to Seek Contribution: Redressability*

18        The final element of Article III standing is that "it must be 'likely,' as opposed to merely

19   'speculative,' that the injury will be 'redressed by a favorable decision.'" Lujan, 504 U.S. at

20   561. Although "[t]here is a close relation between the requirement of power to redress a claimed

21   injury and the requirement of a causal link between the injury asserted and the relief claimed[,

22   t]he two requirements . . . do diverge." Gonzales v. Gorsuch, 688 F.2d 1263 (9th Cir. 1982).

23   PSR does not seek a release from its obligation pursuant to the consent decree to disburse the

24   proceeds from the liquidation of "[a]ll assets and resources of PSR" into the trust. Consent

25   Decree at 16. Instead, PSR seeks "an award of monetary damages to reimburse it for BNSF's

26   equitable share of liability [and] a declaratory judgment for costs that may be required in the

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   future." Response at 14.

2         PSR seems to concede that it will be obligated to provide to the environmental trust any

3   proceeds from the instant litigation. Response at 17 ("PSR and PSR Environmental Trust were

4   instructed to use 'best efforts' to '[m]aximize the amount of funds paid into the Fund and the

5   registry of this court, consistent with this Consent Decree.' The Consent Decree recognizes that

6   PSR would pursue contribution claims that it had against any other Potentially Responsible

7   Parties.") (citations omitted). Because the benefit of the remedy available to PSR will accrue

8   directly to this third party, the harm PSR has suffered will not be redressed by a favorable

9   outcome. Simon v. E. Ky. Welfare Rights Org., 426 U.S. 26, 39 ("The necessity that the

10  plaintiff who seeks to invoke judicial power stand to profit in some personal interest remains an

11  Art. III requirement.") PSR does not satisfy the third element of the constitutional standing test,

12  and therefore cannot maintain this action.[3]

13        PSR raises two arguments against this result that require treatment in this order. First,

14  PSR argues that a narrow interpretation of the private right of action statute in the MTCA would

15  frustrate the intent of the statute. This argument might be expanded here to suggest that the

16  Court's approach nullifies CERCLA's contribution statute. See 42 U.S.C. § 9613(f)(3)(B) ("A

17  person who has resolved its liability to the United States . . . in an administrative or judicially

18  approved settlement may seek contribution from any person who is not party to a settlement . . .

19  ."). The simple answer to this argument is that entities that have "resolved [their] liability"

20  rarely do so in a manner similar to that of PSR; that is, in a manner that effects the total

21  dismantling of the operations of the pre-existing entity. Thus, in most cases, a post-hoc

22  contribution action will directly benefit the company that was found liable—that company

23  would receive a direct fiduciary benefit for each dollar recovered in contribution actions. If, for

24  _____

25        [3] PSR's analogy to bankruptcy actions is unavailing. The duties and standing of a
    bankruptcy trustee are determined by statute pursuant to a constitutional mandate. See 11
26  U.S.C. § 704; U.S. CONST. art. I, § 8, cl. 4.

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1  example, the consent decree in this case contemplated an amount that would "complete"

2  recovery of the West Seattle site, then PSR could argue that it would be able to retain any

3  recovery it was awarded in excess of that amount.  Because the PSR consent decree requires the

4  disbursements of all PSR interests to the trust, it cannot benefit in any way from the instant

5  action.

6       Second, PSR argues persuasively that this finding on redressability frustrates the purpose

7  of Judge Rothstein's consent decree, which seems to have contemplated the possibility of PSR's

8  pursuit of contribution actions.  Consent Decree at 29 ("Settling Defendant agree that, with

9  respect to any suit or claim for contribution brought by them for matters related to this Consent

10  Decree, they will notify Plaintiffs in writing no later than sixty (60) days prior to the initiation of

11  such suit or claim.").  From a policy perspective, this argument makes sense.  Nonetheless, the

12  Court is not in a position to confer standing where there is none.  PSR's injury under the terms

13  of the consent decree simply cannot be redressed by the present action.  With a proposed remedy

14  from which it will not benefit, PSR lacks a necessary element of Article III standing.

15  **C.**    **Tort Claims**

16       PSR's state law tort claims fail for similar reasons.  Notwithstanding the language that

17  PSR drew upon, in every pollution-related nuisance case cited by PSR, the plaintiff asserted

18  some substantial interest in the property that was polluted.  See Kitsap County v. Allstate Ins.

19  Co., 136 Wn.2d 567 (1998) (homeowners in trailer park where waste was disposed); Tiegs v.

20  Watts, 135 Wn.2d 1 (1998) (commercial farmer irrigating with polluted water); Miotke v.

21  Spokane, 101 Wn.2d 307 (1984) (waterfront property owners); Bales v. Tacoma, 172 Wash. 494

22  (1933) (fish hatchery owner).  PSR has offered no similar argument as to why it had any interest

23  in the use or enjoyment of the area polluted by the marine sediments unit.  The Court need not

24  reach the issue as to whether BNSF's alleged pollution constitutes a discrete or continuous tort.

25                       **III. CONCLUSION**

26       For the foregoing reasons, IT IS HEREBY ORDERED that BNSF's motion for summary

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT

1   judgment (Dkt. # 41) is GRANTED.  The Clerk of the Court is instructed to enter judgment for

2   Burlington Northern and Santa Fe Railway Company and against Pacific Sound Resources.

3

4        DATED this 6th day of February, 2006.

5

6

7

8                                    Robert S. Lasnik
                                     United States District Judge
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER GRANTING MOTION FOR
SUMMARY JUDGMENT
                                        -10-

# EXHIBIT 5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC SOUND RESOURCES, *et al.*,

Plaintiffs,

v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.*,

Defendants.

Case No.  C04-1654L

ORDER ON MOTION FOR
RECONSIDERATION

## I.  Introduction

This matter comes before the Court on "Plaintiff Pacific Sound Resources' Motion for Reconsideration of Order Granting Motion for Summary Judgment" (Dkt. # 62).  In this motion, plaintiff Pacific Sound Resources ("PSR") argues that the Court's previous order dismissing plaintiff's action for lack of standing (Dkt. # 59) constitutes a dismissal for lack of subject matter jurisdiction and that, therefore, the proper remedy is remand to state court, where the action was initiated.  28 U.S.C. § 1447(c).  Defendant Burlington Northern and Santa Fe Railroad ("BNSF") argues that the judgment should stand.

## II.  Standard of Review

First, it is necessary to determine the proper standard of review for the instant motion. The Western District of Washington allows a party to submit a motion for reconsideration of a court order to propose review of matters that "were overlooked or misapprehended by the court." Local Rule 7(h)(2).  Although unspecified, the standard of review for such a motion is likely less

ORDER ON MOTION FOR
RECONSIDERATION

1   rigorous than a motion to alter or amend judgment.  Fed. R. Civ. P. 59(e) (clear error).  This

2   motion is correctly understood as a motion for reconsideration under the local rules.

### III.  Discussion

4        The instant action was removed to this Court pursuant to 28 U.S.C. § 1446 ("Procedure

5   for removal").  After an action is removed, the action (at least with regard to its removal) is

6   governed by 28 U.S.C. § 1447 ("Procedure after removal generally").  This statute includes the

7   provision that "[i]f at any time before final judgment it appears that the district court lacks

8   subject matter jurisdiction, the case shall be remanded" to state court.  28 U.S.C. § 1447(c).  If a

9   party lacks standing to pursue its claim, then the court lacks subject matter jurisdiction over the

10  action.  Cetacean Cmty. v. Bush, 386 F.3d 1169, 1175 (9th Cir. 2004).

11       Section 1447(c) generally is employed in the context of actions where it is determined

12  that federal question or diversity jurisdiction does not confer subject matter jurisdiction on the

13  federal court.  See, e.g., Maine Ass'n of Interdependent Neighborhoods (MAIN) v. Dep't of

14  Human Servs., 876 F.2d 1051, 1054 (1st Cir. 1989).  BNSF removed the instant action pursuant

15  to this Court's diversity jurisdiction.  28 U.S.C. 1332(a)(1).  Although the Court agreed that the

16  parties are diverse, the Court concluded that PSR lacks Article III standing to pursue its claim.

17       The Ninth Circuit has carved out a judicial exception to the statutory mandate to remand

18  found in § 1447(c).  Bell v. City of Kellogg, 922 F.2d 1418, 1425 (9th Cir. 1991) (permitting

19  dismissal in lieu of remand where it is "certain that a remand to state court would be futile").  In

20  that action, the appellant failed to comply with a statutory requirement to post a bond when

21  challenging a tax levy.  The court reasoned that "no comity concerns are involved" between the

22  state and federal courts if the federal court is absolutely certain that the party lacks standing.  Id.

23  The instant action presents a similar circumstance.  This Court based its dismissal on an

24  interpretation of a federal court consent decree by the Wyckoff Company, PSR's predecessor,

25  and on case law interpreting Article III standing.  Because no alternate interpretation of state law

26  by the state court could undermine this lack of standing determination, there are no comity

ORDER ON MOTION FOR
RECONSIDERATION

1  concerns involved.  Thus, pursuant to the futility exception, the Court declines to remand this

2  action.[1]

3        BNSF's response also raises the existence of its counterclaims and cross-claims in

4  support of its argument against remand.  These counterclaims are conditioned on the possibility

5  of BNSF's liability under the Model Toxics Control Act ("MTCA").  Because PSR lacks

6  standing to pursue its claims and the Court declines to remand the action to state court, the

7  presence of BNSF's counterclaims and cross-claims does not prevent this Court from entering a

8  final judgment.  If PSR prevails on appeal, the entire case can proceed in federal court pursuant

9  to diversity jurisdiction.

10                                    **IV. Conclusion**

11        For the foregoing reasons, IT IS HEREBY ORDERED that "Plaintiff Pacific Sound

12  Resources' Motion for Reconsideration of Order Granting Motion for Summary Judgment"

13  (Dkt. # 62) is DENIED.

14

15        DATED this 23rd day of May, 2006.

16

17                                    _Robert S. Lasnik_
                                      Robert S. Lasnik

18                                    United States District Judge

19  _____

20        [1] The Court will not address substantial questions raised by other circuits as to the
    validity of a judicial exception to the plain meaning of a clearly written statute.  See Coyne v.
21  American Tobacco Co., 183 F.3d 488, 496–97 (6th Cir. 1999) (rejecting notion of a judicial
    exception to § 1447(c)); Univ. of S. Ala. v. Am. Tobacco Co., 168 F.3d 405, 410–11 (11th Cir.
22  1999) (same); Bromwell v. Mich. Mut. Ins. Co., 115 F.3d 208, 213–14 (3d Cir. 1997) (same);
23  Roach v. W. Va. Reg'l Jail & Corr. Facility Auth., 74 F.3d 46, 49 (4th Cir. 1996) (same); Smith
    v. Wis. Dep't of Agric., 23 F.3d 1134, 1139 (7th Cir. 1994) (same); Barbara v. N.Y. Stock
24  Exch., 99 F.3d 49, 56 n.4 (2d Cir. 1996); Jepsen v. Texaco, Inc., 68 F.3d 483, 1995 WL 607630,
25  at *3 (10th Cir. 1995) (same); Maine Ass'n of Interdependent Neighborhoods (MAIN) v. Dep't
    of Human Servs., 876 F.2d 1051, 1054 (1st Cir. 1989) (suggesting same).  Ninth Circuit
26  precedent is binding on this Court.

ORDER ON MOTION FOR
RECONSIDERATION
                                      -3-

# EXHIBIT 6

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

PACIFIC SOUND RESOURCES, *et al.,*

                Plaintiffs,

       v.

THE BURLINGTON NORTHERN AND
SANTA FE RAILWAY COMPANY, *et al.,*

              Defendants.

Case No.  C04-1654L

ORDER ON MOTION FOR
ATTORNEY'S FEES

This matter comes before the Court on "Defendant BNSF's Motion for Reasonable Attorneys' Fees and Costs" (Dkt. # 64).  In its opposition, Plaintiff Pacific Sound Resources ("PSR") argues, among other things, that the fees and costs are unreasonably high.  The Burlington Northern and Santa Fe Railway Company ("BNSF") counters that they merely reflect reasonable preparation for a high stakes lawsuit.

First, several of PSR's arguments rely on the hope that this Court would issue a favorable ruling on PSR's motion for reconsideration and to remand this action to state court.  The Court declined to do so.  That decision, as well as the original dismissal for lack of standing, are now

ORDER ON MOTION FOR
ATTORNEY'S FEES

1  on appeal.  These arguments are therefore moot.  BNSF is the prevailing party and is entitled to

2  attorney's fees pursuant to RCW 70.150D.080.

3       The Supreme Court has held that:

4       A request for attorney's fees should not result in a second major litigation. Ideally,
        of course, litigants will settle the amount of a fee. Where settlement is not
5       possible, the fee applicant bears the burden of establishing entitlement to an award
        and documenting the appropriate hours expended and hourly rates.
6
   Hensley v. Eckerhart, 461 U.S. 424, 437 (1983).  This action was in this Court based on
7
   diversity jurisdiction and BNSF seeks attorney's fees under a state statute, therefore this Court
8
   applies Washington law on reasonable attorney's fees.  The Washington Supreme Court held
9
   that:
10
        The trial court must determine the number of hours reasonably expended in the
11      litigation. To this end, the attorneys must provide reasonable documentation of the
        work performed. This documentation need not be exhaustive or in minute detail,
12      but must inform the court, in addition to the number of hours worked, of the type
        of work performed and the category of attorney who performed the work (i.e.,
13      senior partner, associate, etc.). The court must limit the lodestar to hours
        reasonably expended, and should therefore discount hours spent on unsuccessful
14      claims, duplicated effort, or otherwise unproductive time.

15  Bowers v. Transamerica Title Ins. Co., 100 Wn.2d 581, 597 (1983).  The decision of what

16  constitutes reasonable attorney's fees is within this Court's discretion.  Id.  For the purpose of

17  review, this Court must "provide a concise but clear explanation of its reasons for the fee

18  award."  Hensley, 461 U.S. at 437.

19       The Court finds that BNSF has met its burden to show that the attorney's fees and costs

20  that it proposed are reasonable.  First, PSR sought a large recovery, in excess of $11 million.

21  BNSF's expenses are commensurate with the effort necessary to defend against such a

22  significant liability.  Moreover, this suit lies in a notoriously document-intensive field of law and

23  this legal proceeding has been extant in one form or another for over twenty years.  Second,

24  although BNSF ultimately succeeded on the question of standing, it was forced to defend on a

25  variety of theories and proceeded throughout much of discovery under the assumption that PSR

26  had standing.  It would have been irresponsible to fail to prepare on the assumption that its

ORDER ON MOTION FOR
ATTORNEY'S FEES

1  standing theory would succeed.  This preparation includes the costs and fees associated with

2  BNSF's expert witness, Gary Hokannen, as well as efforts to research a variety of other factual

3  and legal questions.[1]

4       Finally, BNSF's fees and costs have been studiously accounted for.  The declarations

5  attached to the request for fees and costs set forth the exact number of hours and rates of the

6  attorneys and assistants, as well as exactly what they were doing and when.  The Court finds

7  each of the rates to be reasonable in light of the attorneys' qualifications and that the number of

8  hours spent in preparation is also reasonable.  PSR's minor quibbles with exactly how each

9  individual's time was spent are insufficient to merit a modification of the reasonable request.

10  Indeed, PSR is able to make its arguments only because BNSF has provided a level of detail in

11  excess of that required under Bowers.

12       For these reasons, defendant BNSF's request for reasonable attorney's fees in the amount

13  of $1,061,115.42 is GRANTED.

14

15       DATED this 17th day of July, 2006.

16

17  *Mr S Lasnik*

     Robert S. Lasnik

18       United States District Judge

19

20

21

22

23

24

25

26      [1] The parties' respective preparation on these other issues will serve them well in the event of a reversal on either the question of standing or § 1447 remand argument.

ORDER ON MOTION FOR
ATTORNEY'S FEES

-3-